Affirmed and Memorandum Opinion filed November 8, 2005









Affirmed
and Memorandum Opinion filed November 8, 2005.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00025-CV

____________

 

IN THE INTEREST OF
N.S.H.

 



 

On Appeal from the 311th
District Court

Harris County, Texas

Trial Court Cause No. 95-20466

 



 

M E M O R A N D U M   O P I N I O N

Appellant Mikel E. H. appeals from the
trial court=s decree terminating his parental rights
to his biological daughter, N.S.H.  In
four points of error, he challenges the legal and factual sufficiency of the
evidence to support the jury=s verdict that his
parental rights should be terminated and challenges the trial court=s denial of his
motion for continuance.  Concluding the
evidence was legally and factually sufficient to support the jury=s verdict and the
trial court did not abuse its discretion in denying Mikel=s motion for
continuance, we affirm.

Factual and
Procedural Background








Events leading to
the termination proceedings. 
N.S.H. was born in 1994.  By the
time N.S.H. was two and a half months old, Mikel brought her to Patricia H. and
asked Patricia to keep her.[1]  Mikel said N.S.H.=s mother was Adoing dope.@  Mikel moved into Patricia=s residence and
married Patricia in 1995.  During their
marriage Mikel took trips to Tennessee for a week or so at a time and left
N.S.H. in Patricia=s care. 
According to Patricia, Mikel worked at Jiffy Lube for about five months,
but she did not know of any employment Mikel had after that.  Mikel and Patricia had a community property
trucking business, but Mikel did not do much driving, and Patricia did not let
him drive the new trucks because he was always drunk.

Patricia and Mikel divorced in 1998, but
Patricia stayed in the relationship with Mikel because of N.S.H.  After the divorce, N.S.H. stayed mainly with
Patricia although initially Mikel kept N.S.H. at his apartment across the
street.  A few months after the divorce,
Mikel took N.S.H. to Tennessee.  During
that time, he asked Patricia for money to take care of N.S.H.  Less than six months later, Mikel returned to
Houston, got some money, left N.S.H. with Patricia, and returned to Tennessee.

Mikel subsequently acquired a new
girlfriend, Sherry.  When Sherry and
Mikel came to Houston from Tennessee, they stayed in Patricia=s house or in a
motel for which Patricia paid.  The first
time they came, they stayed about three weeks.  They came again in March 2003 and stayed for
several months.








On June 25, 2003, while Mikel and Sherry
were still residing at Patricia=s apartment,
Patricia visited a psychologist and took N.S.H. with her.  N.S.H. waited in another room while Patricia
saw the psychologist.  Patricia was very
depressed because of Mikel.  He was
threatening Patricia and her sister, and Patricia was afraid of him.  During her talk with the psychologist,
Patricia said, AI know how I can get out of here if I want
to.  I=ve got all these
drugs.  I can just mix them all together
and do it.@ 
Her comments were taken as a suicide threat, and someone called the
police.  Several policemen arrived, and
Patricia was taken to a psychiatric ward at the University of Texas.  An officer transported N.S.H. to the
Department of Family and Protective Services (ADFPS@).

DFPS investigator Varrell Milburn spoke
with N.S.H., Mikel, and Sherry that same day. 
Mikel refused to cooperate and was attempting to leave.  DFPS took emergency custody of N.S.H. because
the family was a flight risk, there were allegations of drug abuse and domestic
abuse, N.S.H. was afraid to go home with Mikel, and DFPS could not verify the
family had a stable place to live.

DFPS filed an original petition for the
protection of a child.[2]  At a hearing June 26, 2003, the court appointed
DFPS as temporary managing conservator, thereby triggering a dismissal  date of June 24, 2004.[3]  

Request for
continuance.  After the trial
court granted a 180-day extension, trial was set for November 15, 2004.  On the first day of trial, Mikel filed a
motion for continuance, alleging his mother had died on November 2, 2004, in
Knoxville.  As a result, he had expended
all his resources and had been unable to secure additional resources to return
to Houston.  The trial court denied the
motion and the case proceeded to jury trial.








The trial.  Patricia testified about her relationship
with N.S.H. and Mikel.  During the time
Patricia had N.S.H., Mikel did not provide for N.S.H. in any way.  He never bought diapers, food, or groceries
for N.S.H.  Instead, he demanded money
from Patricia and would blackmail her, saying if she did not provide money, he
would take N.S.H. away.  Patricia
estimated she probably paid Mikel about $40,000; and N.S.H. was apart from
Patricia for only about six months total time. 
When Mikel was not living with Patricia and N.S.H., he would call
Patricia primarily for money, talking with N.S.H. only long enough to say, AHi Baby . . . How
are you?  Let me talk to your mom.@  Both Patricia and her sister gave Mikel
money, and Patricia knew he was spending it on drugs.

According to Patricia, Mikel drank beer on
a daily basis and drank in front of N.S.H. 
Initially he drank a twelve-pack a day, but then he increased it to an
eighteen pack, and subsequently a case. 
Patricia bought the beer for Mikel because he threatened her.  Patricia testified Mikel also used
drugs.  She said he used drugs every day
if he had the money.  The drug use
aggravated his temper and led to arguments between the two of them.  After N.S.H. was born, Patricia saw Mikel use
speed, methamphetamine, marijuana, and crack cocaine.  She saw Mikel purchase marijuana from a
friend, and N.S.H. was with him on some of these occasions.  According to Patricia, Mikel used marijuana
and crack cocaine in N.S.H.=s presence.

Mikel hit Patricia a couple of times, but
not too hard.  Once he hit N.S.H. pretty
hard on the top of her head.

Mikel also threatened Patricia with
violence.  She believed N.S.H. would hear
these threats and Mikel did not care whether N.S.H. was there or not.  Once Mikel came to Patricia=s residence with a
pistol and said he would have used it had N.S.H. not been there.  Another time, at about 11:00 P.M., he put a
knife to her throat when she was in bed, told her to get up and get dressed to
go somewhere.  She was afraid and drove
Mikel to get some crack cocaine.  N.S.H.
slept in the back seat of the car.

DFPS investigator Varrell Milburn
testified Mikel and Sherry attended the emergency hearing concerning
N.S.H.  They were wearing the same
clothes as the previous night when she saw them after N.S.H. was taken into
custody.  They also smelled of alcohol.








DFPS substitute care worker Julie Abaneme
testified the DFPS plan of service required Mikel to attend individual
counseling, obtain a job, maintain appropriate housing, complete parenting
classes, obtain alcohol and psychological evaluations, obtain random urine
analyses, and follow through with all the recommendations.  Abaneme referred Mikel for drug evaluation
and, by letter, provided Mikel with information about where to obtain the
evaluation.  Abaneme never received a
response, and no drug evaluation or drug services were done for Mikel.  Mikel also did not submit to a court-required
hair follicle test.

Abaneme was asking the jury to terminate
Mikel=s parental rights
because he had not completed all the tasks in the family service plan, had not
dealt with the domestic violence and ongoing drug abuse, had no stable home,
had not been able to provide for N.S.H., and N.S.H. was afraid of him.  After DFPS took N.S.H. into protective care,
Mikel had lived in several different locations, including some time in jail
because of what she understood to be assault with a deadly weapon.  According to the judgment of conviction,
Mikel committed the assault in question in January 2004.[4]  Abaneme did not believe Mikel was making any
changes in his life that would make him able to parent N.S.H.

Penny Godwin, a Child Advocates volunteer,
was appointed as N.S.H.=s guardian ad litem in July 2003.  She initially met N.S.H. at the DFPS shelter
and observed N.S.H. was very overweight and angry.[5]  In August 2003, N.S.H. was placed in a foster
home, where she remained until the trial. 
Goodwin described N.S.H.=s foster home as a
four bedroom, two-bath house, in which N.S.H. had three brothers and had a very
loving and comfortable relationship with her caregivers.  According to other testimony, the home is a
potential adoptive home, and there is a specific adoptive interest in
N.S.H.  When asked what she believed
would be in N.S.H.=s long-term best interests, Godwin stated
it was her opinion parental rights should be terminated.  She stated Mikel never parented N.S.H.,
N.S.H. is terrified of Mikel, Mikel did not participate in services, or make
any efforts to do anything DFPS requested and suggested he do in order to
regain custody of N.S.H.








N.S.H. testified by deposition.  She stated she had been with a foster family
for over a year, liked where she is living, felt she was being taken good care
of, and was in a place where she felt safe. 
She testified she wanted to live where she was Aright now,@ because she
loved  the people, they were nice, and Ait=s a lot better of
a place than where [she] was before.@

According to N.S.H., before she went into
DFPS=s care, it was
Patricia who really took care of her.  If
she became ill when she was with Mikel, he would call Patricia and ask her to
send money.  N.S.H. did not remember
going to a doctor with her father.  Mikel
would also ask AAunt Libby,@ Patricia=s sister, for
money.  When Patricia and Libby said Ano,@ Mikel would
continue asking until he got his way.

N.S.H. said she knew what it looked like
when someone was using drugs, and she had seen Mikel act like that.  She saw Mikel in a closet one time holding a
pipe up to his mouth.  She described
another incident when he used drugs in a motel bathroom, and Ahe would come out
and he would be all calm and he would get into everything and take it apart and
the room would be a mess.@

N.S.H. thought Acrack@ was green in
color and that people rolled it up in a cigarette and smoked it.[6]  She had seen Mikel or someone in the house
smoke it, and it was what Sherry mostly would roll up.

N.S.H. did not think she had seen a white
powder when she was living with Patricia, but added she would always hear Mikel
Asay it=s something like a
rock or something.@ 
She said it was Apowdery kind of, but it wasn=t, like, powder.@  She thought the rock was white.  One time, in a closet in their apartment, she
saw Mikel and Sherry use the rock in a pipe. 
When asked if Mikel smoked the rock more than one time, N.S.H. answered
she saw them only twice because he smoked in the bathroom, but she could hear
them, and  it sounded like a A>shishhh= kind of noise.@








N.S.H. recalled Mikel used to drink beer,
but then he stopped.  She thought he
stopped because he started to get sick from it. 
When Mikel drank a lot, he acted really angry if he did not get his own
way.  N.S.H. said it made her feel scared
when Mikel was drinking or using drugs because she did not know what was going
to happen next.  Sometimes Patricia would
start crying and N.S.H. would go to her.

N.S.H. stated Mikel would threaten
Patricia, but she had not seen him hit her. 
His threats frightened her.

At the time of the deposition, N.S.H.
weighed ninety-three pounds.  She had
previously weighed 160 pounds.  She
stated if felt good to lose the weight, and her foster mother had helped her
the most to do so.  N.S.H. said her
foster mother told her she was proud of her, and that made her feel good.

According to N.S.H., the people with whom
she was living would like to adopt her. 
When asked how she would feel about that, she responded, AI=d feel C fine.@  She said she loved the people with whom she
was living and did not want to visit Mikel because she was afraid to.  She stated she was scared because Mikel might
become angry and she did not want this to happen because she was not scared
anymore and did not want to be scared again. 
She also described the day DFPS took her into custody and how, when
asked whether she wanted to go to Mikel, she said, Ano,@ because she was
afraid of him and was tired of all the fighting, drugs, and everything.   N.S.H. would like to tell Mikel to stop
drinking and doing drugs because she Awanted to have a
regular family, rather than being put back and forth through places.@  Once she asked Mikel to stop drinking, and he
replied, AI like my beer, and I like my pot.@








N.S.H. said, even if Mikel stopped
drinking and was not with Sherry, she did not want to see him because she still
thought he would be angry and she would be afraid.  She stated she knew what Aterminate@ means: that Mikel
would have Ano rights of seeing me or anything like
that.@  When asked whether she wanted that to happen,
she stated, AYes. 
I still love him and all; but, yes, I want that to happen.@  She did not think he would be a different
person.

The trial court charged the jury:

For the parent rights of the father
Mikel . . . , to be terminated at least one, but not all of the
following ground(s) for termination must be proven by clear and convincing
evidence for Mikel . . . as to the child:

The father knowingly placed or
knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well-being of the child;

OR

The father failed to support the
child in accordance with the father=s ability during a period of one year ending within six
months of the date of the filing of the petition;

AND

By clear and convincing evidence
that:

Termination of [Mikel=s] parental rights would be in the
best interest of the child.

 

The jury found Mikel=s parental rights
should be terminated, and the trial court so decreed.  Mikel now appeals, challenging the legal and
factual sufficiency of the evidence and the trial court=s denial of his
motion for continuance.

Discussion

I.        Legal and Factual Sufficiency of the
Evidence to Support Termination of Mikel=s Parental Rights

 

A.  Standard of Review








In his first three points of error, Mikel
challenges the legal and factual sufficiency of the evidence to support the
involuntary termination of his parental rights. 
A court can order involuntary termination of parental rights only on a
showing of clear and convincing evidence. 
Tex. Fam. Code Ann. ' 161.001 (Vernon
2002); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  AClear and
convincing evidence@ means Athe measure or
degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@  Tex. Fam. Code Ann. ' 101.007 (Vernon
2002); In re J.F.C., 96 S.W.3d at 264.

When reviewing factual findings required
to be made by clear and convincing evidence, we apply a standard of review that
reflects this burden of proof.  Id.  In evaluating the legal sufficiency of the
evidence, we review all the evidence in the light most favorable to the finding
to determine whether a reasonable factfinder could have formed a firm belief or
conviction that the finding was true.  In
re J.F.C., 96 S.W.3d at 265B66.  We assume the factfinder resolved disputed
facts in favor of the finding if a reasonable factfinder could do so, and we
disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible.  Id.
at 266.

In a factual sufficiency review, we must
also determine whether a factfinder could reasonably form a firm belief or
conviction about the truth of the allegations. 
Id.  We should consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved that disputed evidence in favor of its finding.  Id. 
If, in light of the entire record, the disputed evidence a reasonable
factfinder could not have credited in favor of the finding is so significant
that a factfinder could not have reasonably formed a firm belief or conviction,
then the evidence is factually insufficient. 
Id.

B. 
Analysis

1. 
Parental Acts








In Texas, to terminate the parent‑child relationship,
the factfinder must find by clear and convincing evidence both that (1) the
parent committed one or more acts specifically named in the Texas Family Code
as grounds for termination and (2) termination is in the best interest of the
child. Tex. Fam. Code Ann. ' 161.001; In re U.P., 105
S.W.3d 222, 229 (Tex. App.CHouston [14th Dist.] 2003, pet. denied).  In the present case, the jury was instructed
it could find Mikel=s parental rights should be terminated if
either (1) Michael knowingly placed or knowingly allowed N.S.H. to remain in
conditions or surroundings which endangered her physical or emotional
well-being (Asubsection D finding@)  or (2) he failed to support N.S.H. in
accordance with his ability during a period of one year ending within six
months of the date of the filing of the petition (Asubsection F
finding@).  See Tex.
Fam. Code Ann. ' 161.001(1)(D), (F).

In his first point of error, Mikel
challenges the legal and factual sufficiency of the evidence to support a
subsection D finding.  In his second
point of error, he challenges the legal and factually sufficiency of the
evidence to support a subsection F finding. 
We turn now to to the sufficiency of the evidence to support a
subsection D finding.

Under subsection (D), one examines
evidence related to the environment of the child to determine whether the
environment was the source of endangerment to the child=s physical or
emotional well‑being.  In re
J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort Worth 2003,
no pet.).[7]  To endanger means to expose to loss or injury
or to jeopardize.  Tex. Dep=t of Human Servs.
v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
It is not necessary the endangering conduct be directed at the child or
that the child actually suffer injury.  Id.

Although the focus in subsection D is on
the child=s environment, a parent=s conduct in the
home can create an environment that endangers the physical and emotional well‑being
of a child.  J.T.G., 121 S.W.3d at
125.  For example, a parent=s abusive or
violent conduct or that of another resident of a child=s home may produce
an environment that endangers the child=s physical or
emotional well‑being.  Id.  A parent=s or caregiver=s illegal drug use
and drug‑related criminal activity may also support the conclusion the
child=s surroundings
endanger her physical or emotional well‑being.  Id.








Under subsection D, the parent must be
aware of the endangering environment.  See
In re B.S.T., 977 S.W.2d 481,485 (Tex. App.CHouston [14th
Dist.] 1998, no pet.) (holding there was no evidence to support termination
under subsection D because there was no evidence of the father=s knowledge of the
conditions in which his children were living); In re T.H., 131 S.W.3d
598, 603 (Tex. App.CTexarkana 2004, pet. denied) (stating,
even if clear and convincing evidence supported trial court=s finding
environment posed danger to child=s well-being, DFPS
failed to show father knowingly placed or allowed child to remain in such an
environment).  The parent, however, need
not know with certainty the child is in an endangering environment; he need
only be aware of the environment=s potential for
danger.  See In re C.L.C., 119
S.W.3d 382, 392 (Tex. App.CTyler 2003, no
pet.) (stating it is sufficient the parent was aware of potential for danger to
child in such environment and disregarded that risk); In re Tidwell, 35
S.W.3d 115, 119B20 (Tex. App.CTexarkana 2000, no
pet.) (stating it is not necessary for mother to have had certain knowledge
sexual molestation offense actually occurred; it is sufficient she was aware of
potential for danger to children and disregarded risk by
breaking agreement with court and placing and leaving children in that
environment).

In light of the preceding case law, the
following evidence supports a subsection D finding in the present case:

$                  
Evidence of Mikel=s pattern of
illegal drug activities, including drug use in N.S.H.=s presence, once
permitting N.S.H. to be with him in the car when he went to purchase crack
cocaine, purchasing marijuana on several occasions while N.S.H. was with him,
and responding to N.S.H.=s request he quit drinking by telling her
he liked his beer and he liked his pot;

$                  
Evidence of Mikel=s abuse of
alcohol,  including drinking beer on a
daily basis and in N.S.H.=s presence, acting Areally mad@ when he drank a
lot; and responding, as he did to N.S.H.=s request he quit
drinking;








$                  
Evidence of Mikel=s threats and
physical abuse, including hitting N.S.H. once Apretty hard on the
head,@ screaming at her
and verbally abusing her, hitting Patricia a couple of times, putting a knife
to Patricia=s throat, and telling Patricia he would
use a pistol but for N.S.H.=s presence;

$                  
Evidence of N.S.H.=s awareness of the
preceding conduct, her testimony she was afraid when Mikel drank or used drugs
because she did not know what would happen next, and her testimony she was
afraid of him and was tired of all the fighting, drugs, and everything; and

$                  
Evidence of Mikel=s criminal
assaults, including a conviction for an assault committed after N.S.H. came
into DFPS=s care.

Given this evidence, a reasonable trier of
fact could have formed a firm belief or conviction Mikel knowingly placed or
knowingly allowed N.S.H. to remain in conditions or surroundings which
endangered her physical or emotional well-being.  There is also no disputed evidence such that
a reasonable factfinder could not have resolved that disputed evidence in favor
of a subsection D finding.  The evidence
is legally and factually sufficient to support a subsection D finding.  See J.F.C., 96 S.W.3d at 265B66.  Accordingly, we overrule Mikel=s first point of
error.

Having concluded the evidence was legally
and factually sufficient to support a subsection D finding, we need not address
his second point of error challenging the evidence to support a subsection F
finding.  See In re A.V., 113
S.W.3d 355, 362 (Tex. 2003) (stating only one predicate finding under section
161.001(1) is necessary to support judgment of termination when there is also a
finding termination is in child=s best interest).

2.  Child=s Best Interest








In his third point of error, Mikel
contends the evidence is legally and factually insufficient to support a
finding termination is in N.S.H.=s best interest as
required under Texas Family Code section 161.001(2).  See Tex.
Fam. Code Ann. ' 161.001(2).  There is a strong presumption that keeping a
child with the natural parent serves the child=s best
interest.  In re U.P., 105 S.W.3d
at 230; see Tex. Fam. Code Ann.
'' 153.131(b), .191,
.252 (Vernon 2002).  DFPS had the burden
to rebut this presumption.  In re U.P.,
105 S.W.3d at 230.  To rebut this
presumption, DFPS needed to present clear and convincing evidence of the
natural parent=s present unfitness.  Id.

Factors that may overcome the presumption
in favor of keeping a child with the natural parent include (1) the desires of
the child; (2) the present and future physical and emotional needs of the
child; (3) the present and future emotional and physical danger to the child;
(4) the parental abilities of the person seeking custody; (5) the programs
available to assist those persons seeking custody in promoting the best
interest of the child; (6) plans for the child by the individuals or agency
seeking custody; (7) the stability of the home or proposed placement; (8) acts
or omissions of the parent that indicate the existing parent‑child
relationship is not appropriate; and (9) any excuse for the parent=s acts or
omissions.  Holley v. Adams, 544
S.W.2d 367, 372 (Tex. 1976); In re U.P. at 230.  This list is not exhaustive, nor is evidence
required on all nine factors.  Holley,
544 S.W.2d at 327; In re U.P. at 230.

The following evidence in the present case
supports a finding that termination of Mikel=s parental rights
is in N.S.H.=s best interest:

$                  
The desires of the childCevidence showing
N.S.H. knew what termination meant and wanted Mikel=s parental rights
terminated;

$                  
The present and future physical and emotional needs of the
childCevidence showing
(a) N.S.H. was afraid of Mikel and still feared him at the time of her
deposition, (b) N.S.H. believes Mikel will not change, (c) Mikel has done
nothing to alleviate those fears, but indicated to N.S.H. he did not want to
quit drinking or smoking marijuana and (c) Mikel has not provided a stable
living environment;








$                  
The present and future emotional and physical danger to the
childCevidence showing
(a) Mikel becomes angry when he abuses drugs or alcohol, (b) he responded
negatively to N.S.H.=s request that he quit drinking, (c) he
did not participate in services to address his behavior after N.S.H. came into
DFPS=s custody;

$                  
The parental abilities of the person seeking custodyCevidence showing
Mikel ceded care and support of N.S.H. to Patricia most of the time and would
threaten to take N.S.H. away from Patricia if Patricia did not give him money;

$                  
The programs available to assist those persons seeking
custody in promoting the best interest of the childCevidence showing
Mikel did not participate in the services available to him during the year and
a half N.S.H. was in DFPS=s custody;

$                  
Plans for the child by the individuals or agency seeking
custodyCevidence showing
DFPS has placed N.S.H. in a loving foster home, her placement is a potential
adoptive home, and there is a specific adoptive interest in her; and

$                  
Acts or omissions of the parent that indicate the existing
parent‑child relationship is not appropriateCevidence showing
N.S.H. is afraid of Mikel because when he is drinking or abusing drugs she does
not know what is going to happen next.

In contrast, Mikel points to letters he
wrote to N.S.H. after she was in DFPS=s custody.  In these letters, he expressed his love for
her and his intent to change.

Having reviewed all the evidence in the
light most favorable to a finding the termination of the parent-child
relationship was in N.S.H.=s best interest,
we conclude a reasonable factfinder could have formed a firm belief or
conviction such a finding was true.  See
J.F.C., 96 S.W.3d at 266.  We also
conclude any disputed evidence is not such that a reasonable factfinder could
not have resolved that disputed evidence in favor of its finding.  See id.  








The evidence is legally and factually
sufficient to support a finding that termination of the parent‑child
relationship is in N.S.H.=s best interest.  We therefore overrule Mikel=s third point of
error.

II.       Whether the Trial Court Abused its
Discretion and Deprived Mikel of his Constitutional Rights when it Denied his
Motion for Continuance.

 

A. 
Procedural Background

In his fourth point of error, Mikel
contends (1) that the trial court Aerred@ in denying his
motion for continuance and (2) that proceeding to trial in his absence deprived
him of his rights to confrontation, due process, and equal protection under the
Constitutions of the United States and the State of Texas.  On November 15, 2004, the day set for trial,
Mikel=s counsel filed a
motion for continuance, comprising the following allegations:

1. 
This case is presently set for jury trial on November 15, 2004.  This Court has previously extended the Court=s jurisdiction in ths case pursuant
to '261.401(b).  This case is set for dimissal [sic] on or
about December 22, 2004. [Mikel] would agree to waive his right to make a
Motion for Dismissal under '263.402 and agrees not to complain about any delays created
at his request.

2. 
On November 2, 2004, [Mikel=s] mother, died in Knoxville, Tennessee.  Due to the unforseen death of his mother,
Alma Gossett, Respondent was forced to expend of [sic] all his resources and
has been unable to secure enough additional resources to return to Houston for
trial.  As a Respondent to this suit,
[Mikel=s] testimony at the trial of this
cause relative to the Termination filed by [DFPS] is material.

3. 
This is [Mikel=s] first request for continuance
not sought solely for delay but that justice may be done.

WHEREFORE, PREMISES CONSIDERED, [Mikel] requests
the Court to grant this Motion for Continuance, and continue the case for a
sufficient period of time to allow for [Mikel=s] presence at
trial.

The only sworn statement made part of the
motion was the following statement by Mikel=s counsel:








I, the undersigned attorney of record, swear under oath
that I have talked with [Mikel] and that my Legal Assistant has confirmed the
death with the Berry Funeral Home in Knoxville, Tennessee and the remaining
matters set forth in the Motion for Continuance are true and correct to the
best of my knowledge and belief.

Mikel=s counsel
presented no additional evidence at the hearing on the motion.  Counsel did inform the court he had discussed
with Mikel the importance of Mikel=s presence at
trial and the mandated time limits in the case. 
Counsel stated Mikel was willing to go to trial and requested thirty
days to get the resources to come to Houston. 
According to counsel, Mikel was willing to agree to waive any right to
claim dismissal for failure to prosecute in accordance with the guidelines if
the case were not disposed by the dismissal date of December 22, 2004.  Counsel also indicated the court could Aput [the case] to
trial and continue the setting,@ but then finish
it after the deadline.  Counsel argued an
additional thirty or sixty days would not make a significant difference
regarding permanency with respect to the child.

DFPS responded, in part, that because
there was another parent in the suit, Mikel=s claim he would
waive the dismissal deadline did not eliminate the dismissal problem.  Counsel for the absent mother stated they had
Ano position in
this matter.@

The court then reviewed its docket for the
rest of November and December 2004, listing at least thirteen preferential
settings and a separate jury case. 
Finally, the court stated, AIn part
considering the court=s docket and consider[ing] that this
motion was filed today on the date of trial, and given the length of time
between the unfortunate circumstance regarding [Mikel=s] family, the
Motion for Continuance is denied.@

B. 
Standard of Review and Rules Applicable to Motions for Continuance








As Mikel correctly observes, we review
denial of a continuance under an abuse-of-discretion standard.  See In re E.L.T., 93 S.W.3d 372, 374
(Tex. App.CHouston [14th Dist.] 2002, no pet.) (in
context of parental rights termination case, stating decision to grant or deny
motion for continuance is within trial court=s sound discretion).  We cannot substitute our judgment for the
trial court=s, but must determine only whether the
trial court=s action was so arbitrary as to exceed the
bounds of reasonable discretion.  Id.  A trial court abuses its discretion if its
decision is arbitrary, unreasonable, and without reference to any guiding rules
and principles.  Id.  In the present case, the following reasons
support the trial court=s discretion in denying Mikel=s motion: (1) the
motion=s non-compliance
with Texas Rules of Civil Procedure 251 and 252, (2) the timing of the motion
in relation to the purported triggering event, and (3) the closeness of the
mandatory dismissal date.

Texas Rules of Civil Procedure 251 and 252
govern continuances to secure testimony or the presence of a party.  See In Re Uvalle, 102 S.W.3d
337, 340B41 (Tex. App.CAmarillo 2003, no
pet.) (stating continuances for purposes of securing testimony are governed by
rules 251 and 252); In re H.R., 87 S.W.3d 691, 701 (Tex. App.CSan Antonio 2002,
no pet.) (applying requirements of rule 251 to respondent mother=s motion for
continuance based on mother=s alleged illness
and victimization); Hawthorne v. Guenther, 917 S.W.2d 924, 929 (Tex.
App.CBeaumont 1996,
writ denied) (stating, when continuance is sought because of party=s unavailability,
rules governing unavailability of witnesses apply).  Under rule 251, a court shall not grant a
continuance Aexcept for sufficient cause supported by
affidavit, or by consent of the parties, or by operation of law.@  Tex.
R. Civ. P. 251.  Under rule 252,
if the basis of the application for a continuance is want of testimony, the
applicant Ashall make affidavit that such testimony
is material, showing the materiality thereof.@  Tex.
R. Civ. P. 252.

Mikel does not contend a continuance was
warranted by consent of the parties or operation of law.  Instead, he contends his motion was Asupported by affidavit
in accordance with Tex. R. Civ. P. 251.@  We disagree.

Mikel sought a continuance based on his
allegedly having spent all his resources on his mother=s funeral and the
resultant lack of resources to return to Houston.  He further contended, because he was the
respondent,  his testimony was Amaterial.@








The only sworn statement provided with the
motion was that of Mikel=s counsel, who stated merely (1) he had
spoken with Mikel, (2) his legal assistant had confirmed the death with a
funeral home in Knoxville, and (3)  Athe remaining
matters@ in the motion
were Atrue and correct
to best of [his] knowledge and belief.@  If counsel=s statement was
intended to support Mikel=s allegation he lacked the resources to
travel to Houston, the statement was insufficient because it is based on Aknowledge and
belief,@ rather than
counsel=s personal
knowledge.  See Hawthorne, 917
S.W.2d at 930.

There is also nothing, either in the
motion or in counsel=s statement, to indicate the nature of
Mikel=s expected
testimony.  Because Mikel did not state
what he expected to prove by his testimony, he did not comply with rule 252.  See Lynd v. Wesley, 705 S.W.2d 759,
764 (Tex. App.CHouston [14th Dist.] 1986, no writ).

Because Mikel did not comply with the
requirements of rules 251 and 252, we may presume the trial court did not abuse
its discretion in denying his motion for continuance.  See Villegas v. Carter, 711 S.W.2d
624, 626 (Tex. 1986) (stating, generally when movants fail to comply with rule
251=s requirement that
motion for continuance be Asupported by
affidavit,@ court presumes trial court did not abuse
its discretion in denying the motion, although not applying presumption on
facts of case); see also Verkin v. Southwest Ctr. One, Ltd., 784
S.W.2d 92, 98 (Tex. App.CHouston [1st Dist.] 1989, writ denied)
(holding, in summary judgment case, because appellant did not comply with rules
166a(f), 251, or 252, the trial court did not abuse its discretion in denying
motion for continuance).








In denying the motion, the trial court
referred to Athe length of time between the unfortunate
circumstances regarding [Mikel=s] family.@  Although Mikel=s mother allegedly
died on November 2, 2004, Mikel did not file his motion until November 15,
2004, the day of trial.  A trial court
does not abuse its discretion when it denies a motion for continuance on the
ground the motion could have been filed earlier.  See Beutel v. Dallas County Flood Control
Dist., 916 S.W.2d 685, 693 (Tex. App.CWaco 1996, writ
denied) (holding trial court did not commit clear abuse of discretion in
denying motion for continuance on ground that issue on which motion was based
could have been brought before court several months earlier, rather than one
week before trial).  Additionally,
although counsel represented Mikel needed only thirty days to secure the funds
to return to Houston, this representation was arguably speculative.  See Rodriguez v. Tex. Dep=t of Human Servs., 737 S.W.2d 25,
28 (Tex. App.CEl Paso 1987, no writ) (holding trial
court did not abuse discretion in denying mother=s motion for
continuance of termination proceeding when mother sought continuance until she
returned for her first parole hearing in hopes of being released from prison,
because matter was purely speculative).

Finally, the court had already granted one
extension in the case, and under Texas Family Code section 263.401, the trial
court was required to dismiss the case if it had not rendered a final order by
December 22, 2004.  See Tex. Fam. Code Ann. ' 263.401 (Vernon
2002).  Although Mikel may have agreed to
waive his right to object to the trial court=s not rendering a
final order before the deadline for dismissal, the child=s mother did
not.  See id. ' 263.402(b)
(stating party to suit under chapter 263, who fails to make timely motion to
dismiss suit or to make motion requesting court to render final order before
deadline for dismissal under subchapter E waives the right to object to court=s failure to
dismiss the suit).  Finally, as a party,
DFPS could have sought a writ of mandamus to compel the trial court to comply
with its duty to set a final hearing on a date that allowed the trial court to
render a final order before the dismissal date. 
See id. ' 263.304.

Given the preceding factors, we conclude
the trial court did not abuse its discretion in denying Mikel=s motion for
continuance.   

C. 
Mikel=s Constitutional Claims








Mikel, however, contends denial of his
motion for continuance violated his rights to due process, confrontation, and
equal protection under the Federal and State Constitutions.[8]  The right to confrontation applies only to
criminal proceedings.  In the Interest
of C.W., 65 S.W.3d 353, 354 (Tex. App.CBeaumont 2001, no
pet.) (citing Tex. Dep=t of Pub. Safety
v. Duggin, 962 S.W.2d 76, 81 (Tex. App.CHouston [1st
Dist.] 1997, no pet.)), disapproved on other grounds by In re Z.L.T.,
124 S.W.3d 163, 166 (Tex. 2003).  Mikel
does not explain how denial of a continuance implicated his right to equal
protection and does not cite any authority in support of this claim.  Accordingly, Mikel has waived his equal
protection claim.  See Nguyen v.
Kosnoski, 93 S.W.3d 186, 188 (Tex. App.CHouston [14th
Dist.] 2002, no pet.) (stating issue not supported by authority or references
to record is waived); see also Tex.
R. App. P. 38.1(h) (stating Mikel=s brief must
contain clear and concise argument for contentions made, with appropriate
citations to authorities and record).  We
turn therefore to Mikel=s due process claim.[9]

There is no mechanical test for
determining when the denial of a continuance is so arbitrary as to violate due
process.  Guerrero‑Ramirez v.
Tex. State Bd. of Med. Examiners, 867 S.W.2d 911, 916 (Tex. App.CAustin 1993, no
writ) (citing Ungar v. Sarafite, 376 U.S. 575, 591, 84 S. Ct. 841, 850
(1964)).  Instead, a reviewing court must
consider the circumstances presented to the trial judge at the time the request
is denied.  Id.  (citing Ungar, 376 U.S. at 591, 84 S.
Ct. at 850).








As discussed above, the circumstances
presented to the trial court included the nonconformity of the motion, the
timing and speculative nature of the request, and the impending dismissal
deadline.  The third circumstance
implicated the State=s interest in providing permanence and
stability to the child.  See In re
L.J.S., 96 S.W.3d 692, 693 (Tex. App.CAmarillo 2003,
pet. denied) (stating Texas Family Code section 263.401 exists to facilitate
permanence and stability in the lives of children subjected to DFPS involvement
by limiting time within which DFPS can prosecute actions to terminate parental
rights or have it designated conservator). 
In light of these circumstances, denial of the continuance was not so
arbitrary as to violate Mikel=s right to due
process.[10]

Conclusion

Having concluded the evidence was legally
and factually sufficient to support a finding Mikel knowingly placed or
knowingly allowed N.S.H.  to remain in
conditions or surroundings which endangered her physical or emotional
well-being, we overrule Mikel=s first point of
error.  We therefore need not address his
second point of error.  Having concluded
the evidence was legally and factually sufficient to support a finding termination
of Mikel=s parental rights
was in N.S.H.=s best interests, we overrule Mikel=s third point of
error.  Having concluded the trial court
did not abuse its discretion in denying Mikel=s motion for
continuance, we overrule his fourth point of error.  Accordingly, we affirm the decree of the
trial court terminating Mikel=s parental rights
to N.S.H.

 

 

/s/      John S. Anderson

Justice

 

 

Judgment
rendered and Memorandum Opinion filed November 8, 2005.

Panel
consists of Chief Justice Hedges and Justices Yates and Anderson.











[1]  The testimony
varies about whether N.S.H. was two-and-a-half weeks, or two-and-a-half months,
old when Mikel brought her to Patricia.





[2]  DFPS filed its
original petition in the 315th District Court. 
The case was subsequently consolidated with case number 1995-30466 in
the 311th District Court, which had continuing jurisdiction over N.S.H.





[3]  See Tex. Fam. Code Ann. ' 263.401(a) (Vernon 2002).





[4]  DFPS also
introduced a judgment of conviction for an assault Mikel committed in June
2002.





[5]  Abaneme
testified N.S.H. weighed about 140 pounds when she first came into DFPS=s care.  At the
time of trial she weighed ninety-two pounds, was back to normal, and was happy
about herself.





[6]  As DFPS argued
in closing, N.S.H. appears to have confused Acrack@ with marijuana.





[7]  In contrast,
under subsection (E), the cause of the danger must be the parent=s or another=s
actions or failures to act.  In re
U.P., 105 S.W.3d 222, 236 n.7 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  





[8]  Mikel cites
the following amendments to the United States Constitution: Amendment V
(providing, ANo person shall be . . . deprived of life, liberty, or
property, without due process of law@),
Amendment VI (providing, AIn all criminal prosecutions, the accused shall enjoy
the right . . . to be confronted with the witnesses against him@), and Amendment XIV, section 1 (providing, ANo state shall . . . deprive any person of life,
liberty, or property, without due process of law; nor deny to any person within
its jurisdiction the equal protection of the laws@).  He also cites the following sections of
article I of the Texas Constitution: 
section 3 (providing, AAll free men, when they form a social compact, have
equal rights, and no man, or set of men, is entitled to exclusive separate
public emoluments, or privileges, but in consideration of public services@), section 3a (providing, AEquality under the law shall not be denied or abridged
because of sex, race, color, creed, or national origin@), section 10 (providing, AIn all criminal prosecutions the accused . . .shall be
confronted by the witnesses against him@),
section 13 (providing, AAll courts shall be open, and every person for an
injury done him, in his lands, goods, person or reputation, shall have remedy
by due course of law@), and 19 (providing, ANo
citizen of this State shall be deprived of life, liberty, property, privileges
or immunities, or in any manner disfranchised, except by the due course of the
law of the land@).





[9]  Mikel provides
no argument or authority regarding the protection offered by the Texas
Constitution or how that protection differs from the protection guaranteed by
the U.S. Constitution.  Accordingly, we
do not reach the state constitutional issue. 
See Johnson v. State, 853 S.W.2d 527, 533 (Tex. Crim. App. 1992);
Smith v. State, 993 S.W.2d 408, 415 (Tex. App.CHouston [14th Dist.] 1999, pet. ref=d).





[10]  These
circumstances also distinguish the present case from the out-of-state cases
Mikel cites.