**In the Interest of T.H., A Child.**

**No. 06–03–00108–CV.**

Court of Appeals of Texas, Texarkana.

Submitted Dec. 29, 2003.

Decided March 9, 2004.

Patrice Savage, Carthage, for appellant.

Quita Russell, Ray Bowman, Assistant District Attorney, Longview, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

*Opinion by Justice CARTER.*

John Hunter appeals the judgment of the trial court terminating his parental rights to his child, T.H. The issues presented are timeliness of a jury demand and legal and factual sufficiency of the evidence to support the trial court's findings. We reverse and render judgment in favor of John Hunter.

### Factual and Procedural History

On January 21, 2001, T.H. was born to John and Amanda Hunter. John was incarcerated beginning November 29, 2001. T.H. was in the care of her stepgrandmother, Anita Mitchell, on August 14, 2002, when Mitchell was arrested at the motel room in which they were living. It was at this point T.H. came into the custody of the Texas Department of Protective and Regulatory Services. Shortly after the Department's initial contact with the Hunter family, the Department attempted a reintegration process with Amanda Hunter, but she failed to attend the meeting. Amanda did not contact the Department until May 2003, when she wrote a letter from prison.

On August 15, 2002, the Department filed its petition for protection of a child, for conservatorship, and for termination in suit affecting the parent-child relationship. Later in August 2002, John Hunter wrote a letter to the Department asking that it not terminate his parental rights and suggesting his mother, Laurie O'Bryant, serve as T.H.'s caregiver. In that letter, John stated that he went to prison November 29, 2001, and that T.H. had been in the care of T.H.'s maternal grandfather and stepgrandmother (Rick Pilling and Anita Mitchell) for five or six months.[1] His letter indicated that, only after Amanda contacted him on July 22, 2002, did he know Amanda had picked up T.H. from Pilling's and Mitchell's home. He complained that Amanda had been using drugs and that he felt she should be charged with child abandonment.[2]

In that same conversation, Amanda told him she had left T.H. at the home of her mother (Cynthia Pilling). John states he did not know T.H. was living in a motel with her stepgrandmother, Anita Mitchell. According to John's letter and testimony, he believed T.H. was with her maternal grandmother, Mrs. Pilling, in New Orleans.

The Department designed a service plan with John in November 2002. In this service plan, John was required to cooperate with the Department in placing T.H. with relatives. The Department attempted to arrange for T.H. to live with T.H.'s maternal great aunt and uncle in New Orleans, Mr. and Mrs. Hepting. However, the couple separated, and the plans for T.H. to live with the Heptings fell through in May 2003. John states he had not known about this development. Caseworkers concede they did not contact John regarding the matter.

On the day of the hearing, August 8, 2003, John was imprisoned in Louisiana for burglary and appeared by telephone.[3]

---

1. On this point, the record is unclear as to who was taking care of T.H. at the time John went to prison. During his testimony, John indicates that he left T.H. in Amanda's care and that Amanda had an established household at the time. It was only after his incarceration that Amanda began to use heroin and started going "buck wild."

2. John states that, after hearing what she had done, he filed for divorce on July 31, 2002.

3. The burglaries with which John was charged in Louisiana resulted in a six-year suspended sentence, with three years of probation. His probation was revoked and his sentence was reduced to four years.

At the trial, Bertile Johnson, a caseworker for Child Protective Services, testified she had never had any conversation or correspondence with John. She also testified she was unaware of the fact John had left the name and contact information for his mother, recommending that T.H. be placed with her. Dani Price, a Court–Appointed Special Advocate (CASA) volunteer, also testified she had never contacted John. Shurhonda Thurmond, a child caseworker with the Department, testified that she never contacted John by telephone or letter and that she knew of no caseworker who had contacted him.

In its termination order, the trial court found that John knowingly placed or knowingly allowed T.H. to remain in conditions or surroundings which endangered the physical or emotional well-being of the child and that John engaged in conduct which endangered the physical and emotional well-being of the child. Finding also that termination of John's parental rights was in T.H.'s best interest, the trial court terminated his parent-child relationship with T.H.

### Denial of Request for Jury Trial

 In his supplemental point of error, John contends the trial court erred in denying his request for a jury trial. For reasons set forth below, we overrule his point of error. We review the entire record for an abuse of the trial court's discretion in denying a request for a jury trial. *Mercedes–Benz Credit Corp. v. Rhyne,* 925 S.W.2d 664, 666 (Tex.1996).

The Texas Rules of Civil Procedure provide that "[n]o jury trial shall be had in any civil suit, unless a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance." Tex.R. Civ. P. 216. A request for a jury made within thirty days of trial may still be timely under certain circumstances. For instance, lack of notice of a trial setting can have an effect on the timeliness of a jury request. *See Bell Helicopter Textron, Inc. v. Abbott,* 863 S.W.2d 139, 141 (Tex.App.-Texarkana 1993, writ denied). Rule 245 of the Texas Rules of Civil Procedure was amended to harmonize with Rule 216 and to require notice of trial setting before the time for demanding a jury.[4] Tex.R. Civ. P. 245; *Abbott,* 863 S.W.2d at 141. "When compliance with Rule 216 is made impossible by failure to give the notice required by Rule 245, the jury demand will be deemed timely." *Id.*

The Department's petition in this case was first filed August 15, 2002. The case was set on the nonjury docket May 15, 2003. On May 14, 2003, the trial court appointed counsel for John. The trial date was set for July 29, 2003, but was rescheduled for August 8, 2003. John's oral re-

---

4. John argues the trial court failed to give him notice of the July 29, 2003, trial date and, therefore, compliance with Rule 216 was impossible. He relies on our decision in *In re J.C.,* 108 S.W.3d 914, 916–17 (Tex.App.-Texarkana 2003, no pet.), for his argument that the request should be considered timely since counsel only had eleven days' notice before trial and, therefore, compliance with Rule 216 was rendered impossible. First, the record shows counsel was appointed on May 14, 2003. From the record, we cannot determine whether counsel complained of a lack of notice of the trial date or lack of notice of his appointment to the case. Second, even if this argument were meritorious, John's brief and the record are both silent as to any reason why counsel did not file a written jury request in those eleven days. In *J.C.,* trial counsel was appointed only two weeks before trial and soon thereafter requested a jury trial. The trial court concluded the request was untimely. We reversed the decision considering the late appointment of counsel. Since counsel was appointed much sooner here and because there was no written request for a jury trial at any time before trial, we find the instant case distinguishable.

quest for a jury trial came after trial began. The record shows that no written request for a jury trial was ever made to the trial court and that no request was made before the commencement of trial.

While we note that Texas caselaw, in its recognition that a right to a jury trial is one of "our most precious rights," has been somewhat flexible in its application of the requirements for jury trial requests and jury fees, we do not think an oral request after trial has already begun is within the range of acceptable forms or timing. *See Gen. Motors Corp. v. Gayle,* 951 S.W.2d 469, 476–77 (Tex.1997) (orig. proceeding). The trial court acted within its discretion when it overruled John's oral request for a jury made after trial began. We overrule this point of error.

### Applicable Law and Standard of Review

■ A court may order involuntary termination only if the court finds clear and convincing evidence supports two conclusions: (1) a parent has committed a predicate act or omission harmful to the child, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (Vernon 2002). Any complaint that the evidence is legally or factually insufficient to support the findings necessary for termination is analyzed by a heightened standard of appellate review. *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002).

Here, John complains of both legal and factual sufficiency of the evidence supporting the trial court's findings. When an appellant raises both legal and factual sufficiency issues, we review the legal sufficiency point first to determine whether there is any probative evidence to support the trial court's finding. *See Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981). In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most favorable to the

finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the State's allegations. TEX. FAM.CODE ANN. § 101.007 (Vernon 2002); *J.F.C.,* 96 S.W.3d at 266.

### Conditions or Surroundings which Endanger the Child

■ Hunter contends the evidence is legally insufficient to establish by clear and convincing evidence he "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM.CODE ANN. § 161.001(1)(D). Under this section, we look to see if the environment itself poses a danger to the child's physical or emotional well-being. *In re S.H.A.,* 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.).

First, the Department fails to establish the environment posed a danger to the physical or emotional well-being of T.H. The record does not demonstrate the danger posed by the environment at the motel in which T.H. had been living with her stepgrandmother. Johnson testified Child Protective Services got involved in this case because it was called by the police when Mitchell was arrested for outstanding warrants. The Department alleges the stepgrandmother was mentally and emotionally unstable, stating she saw a psychiatrist for six years and sought to enter a program offered by a local mental health association. Without more, the bare contention a caretaker saw a psychiatrist or sought to take advantage of mental health services will not support a finding under this subsection of the Texas Family Code. Further, Thurmond, the child's caseworker, testified that T.H.'s stepgrandmother was making certain T.H. was "current on her medicals" and that she was able to

provide substantial background information on T.H.

There is some evidence T.H. was hospitalized shortly before she was placed in her current foster home in December 2002. This fact is the strongest evidence the Department presented that would establish T.H. was in conditions or surroundings which posed a threat to her well-being. There is no other evidence such as records from her hospital stay or testimony from an attending physician that would link the cause for hospitalization to the conditions in which T.H. was living. At any rate, the record demonstrates that T.H.'s hospitalization was a result of the pneumonia she developed at her previous foster home in which the Department placed her from August 14, 2002 to December 18, 2002. John certainly did not knowingly place her in these conditions.

Second, even if clear and convincing evidence supported the trial court's finding that the environment posed a danger to T.H.'s well-being, the Department failed to show that John knowingly placed or allowed T.H. to remain in such an environment. The workers and CASA volunteer associated with the case all concede they were never in contact with John. Specifically, John was never told that the plans fell through with the placement of T.H. with the great aunt and uncle, the Heptings. No one associated with the Department told John of the whereabouts of T.H. or the status of her placement. The only person who did contact John was Amanda, who told him T.H. was living with Amanda's mother.

The Department appears to argue that, even if T.H. would have been placed with John's mother as he recommended, that living situation would have posed a danger to T.H. because John's mother suffered from post-traumatic stress disorder from having been shot and because she was only "partially employed." We are unconvinced by this argument because, quite simply, it never happened. T.H. never lived with John's mother. Therefore, such a living environment cannot be a basis for a finding that John knowingly placed T.H. in a dangerous environment.

■ In summary, the record reveals that John complied with the requirements of the Department's service plan and, beyond that, he was not regularly informed of the status of T.H.'s placement. There is some evidence T.H. was hospitalized, although we have no medical records or doctor's testimony. Even viewing the evidence before us in the light most favorable to the termination order, however, we find no evidence John knowingly placed or allowed T.H. to remain in the living conditions, which the Department contends led to T.H.'s hospitalization. There is legally insufficient evidence on which the trial court could have found John knowingly placed or allowed T.H. to remain in conditions or surroundings which endangered her physical or emotional well-being.[5]

## Conduct which Endangers the Child

Hunter also challenges the legal sufficiency of the evidence to support the trial court's finding he engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers

5. Having found the evidence was legally insufficient, we do not address John's contentions as to the factual sufficiency of the evidence to support the findings. *See Wal–Mart Stores v. Bertrand*, 37 S.W.3d 1, 12 (Tex.App.-Tyler 2000, pet. denied). Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points which would afford the party the greatest relief. *Bradleys' Elec. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex.1999).

the physical or emotional well-being of the child. Tex. Fam.Code Ann. § 161.001(E); *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 534 (Tex.1987).

■ Here, our inquiry, unlike that under Section 161.001(1)(D), focuses on conduct of either the parent or the persons with whom the parent has placed the children. *See In re P.S.,* 766 S.W.2d 833, 835 (Tex.App.-Houston [1st Dist.] 1989, no writ). Subsection (D) permits termination based on a single act or omission, while subsection (E) requires a "course of conduct." *In re R.G.,* 61 S.W.3d 661, 667 (Tex.App.-Waco 2001, no pet.). While the term "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Boyd,* 727 S.W.2d at 533. In our review, we look not only at evidence regarding the parent's active conduct, but also evidence showing the parent's omissions or failures to act. *P.S.,* 766 S.W.2d at 835.

■ Here, the Department seems to argue that John's criminal history constitutes a sufficient course of conduct that endangers T.H.'s physical or emotional well-being. The argument is that he "left the child adrift in the world"; that he "exerted no control over who was around her"; and "provided no environment." Mere imprisonment, standing alone, will not constitute engaging in conduct which endangers the emotional or physical well-being of a child. *Boyd,* 727 S.W.2d at 533. Further, the commission of any intentional act which results in imprisonment, including violation of probation, is not sufficient grounds, standing alone, for termination. *Mayfield v. Smith,* 608 S.W.2d 767, 771 (Tex.Civ.App.-Tyler 1980, no writ).

The Legislature has provided that, in certain circumstances, a parent's rights may be terminated for engaging in criminal conduct. Tex. Fam.Code Ann. § 161.001(Q) (conviction of an offense and confinement and an inability to care for a child for two years from the date of the filing of the petition). It appears this provision is inapplicable in this case.

■ The Department also points to the mental instability of T.H.'s stepgrandmother, Mitchell, and of John's mother, O'Bryant, whom he unsuccessfully recommended as caretaker for T.H. We find very little convincing evidence their conduct posed a danger to T.H. While the stepgrandmother was arrested during her care of T.H., her arrest, similar to John's incarceration, is insufficient to support a finding under this subsection. *See Boyd,* 727 S.W.2d at 533. Again, O'Bryant's capacity for parenting T.H. and her criminal history are irrelevant to this issue because all parties agree T.H. was never in her care.

The law requires the Department to prove John knowingly placed T.H. with persons whose conduct posed a danger to T.H.'s well-being. Here, even viewing the evidence in a light most favorable to the finding, we conclude that a reasonable jury could not have formed a firm conviction or belief that John knowingly did so. In fact, the Department's own evidence confirms John's contention he did not know T.H. was living with her stepgrandmother in a motel room. There is legally insufficient evidence to support the trial court's finding that John either engaged in conduct or placed T.H. in the care of those whose conduct posed a danger to her well-being.

**Conclusion**

After reviewing all of the evidence in the light most favorable to the trial court's findings, we conclude there is no clear and convincing evidence to support the grounds for termination. We conclude

that a reasonable trier of fact could not have formed a firm belief or conviction that such findings were true. This determination is dispositive of this appeal and, therefore, we do not address any other issue.

We reverse and render judgment in favor of John Hunter.