

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 2-07-056-CV**

IN THE INTEREST OF D.F., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

In two points, Appellant David F. complains that the evidence was legally and factually insufficient to support the termination of his parental rights. We affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

On January 25, 2000, Yvonne F. gave birth to D.F. in North Carolina while married to David. After she was born, D.F. lived with Yvonne but spent

---

[1] *See* TEX. R. APP. P. 47.4.

nearly every day with David until she turned three years old. While in North Carolina, David was convicted of two misdemeanors, a 2003 conviction for possession of stolen property and a conviction in either 2003 or 2004 for the assault of his sister. David served approximately fifty-five days for the assault. Further, David admitted that he most likely used drugs in some capacity during the time that he had contact with D.F. but maintained that he last used drugs in 2004.

In late 2003, Yvonne gave three of her children, but not D.F., to foster care in North Carolina. Around that same time, North Carolina officials asked D.F.'s godmother, Shelly F., if she would take care of D.F. D.F. then moved out of Yvonne's home and in with Shelly for approximately six months before returning to live with Yvonne.

In 2004, Yvonne filed for divorce from David based on the ground that they had been separated for at least one year. David testified that he and Yvonne were not actually separated but that he did not contest the allegations because he had no knowledge of the divorce proceedings. David stated that he found out about the divorce in February 2007, only a week before the trial. David further testified that the couple was officially divorced on May 14, 2004, after notice was published in the newspaper for three weeks with no response.

Yvonne's three children that had been in foster care returned to live with

Yvonne in late 2004. Shortly thereafter, Yvonne left North Carolina for Texas with all four of her children and her then-boyfriend Michael J. David last visited D.F. in 2004 before she left for Texas. Eventually the children, except for D.F., came back to live in North Carolina. At some point after Yvonne, Michael, and D.F. moved to Texas, David moved from North Carolina to California, where in 2005 he was convicted of the felony offense of unlawful sex with a minor. The female minor was seventeen years old at the time of the offense.

On October 31, 2005, Denalyn Allen, a Child Protective Services ("CPS") investigator, received allegations of Yvonne and Michael's neglectful supervision and drug use and initiated an investigation.[2] Allen investigated the household on November 3, 2005, and found that the house had no electricity and very little food. She asked D.F. about the alleged domestic violence and drug use in the home, and D.F. stated that sometimes when her "mom and dad" would fight, they would throw things. D.F. also told Allen that Michael smoked drugs in a blue pipe that "looked like clouds." Both Yvonne and Michael admitted to using drugs but failed to take drug tests requested by CPS. Based on the investigation, CPS placed D.F. with Michael's mother; however, the mother returned D.F. four days later because she was going out of town

---

[2] Allen testified that there had been a previous case at some point, in which Yvonne had been referred to Family Services, but as she recalled, the case was closed because Yvonne moved back to North Carolina.

and could not take D.F. with her. At this time, CPS placed D.F. in foster care. Subsequently, both Yvonne and Michael were arrested, apparently for drug-related offenses. On November 22, 2005, Texas Department of Family Protective Services ("TDFPS" or "CPS") filed a petition to terminate both Yvonne and Michael's parental rights.

In either October or November 2005, Michael's mother contacted David and informed him that CPS had initiated an investigation regarding Yvonne and D.F. She also gave him a number to call CPS in Texas. David initially testified that he found out that "CPS" had initiated an investigation of Yvonne but later said that he meant to say that it was "social services" that had initiated the investigation. David admitted that he did not know whether there was a difference between the two in Texas and that he "put it all the same." In response to learning of the investigation, David tried to call Yvonne's mother and made one phone call to Dallas County CPS. He claims that CPS told him that "they had nothing on [Yvonne]" and that he made no efforts to locate D.F. because he was "tossed out."

In August 2006, CPS learned that David might be D.F.'s father, and Pamela Gillinger, a CPS caseworker, called David to inform him that D.F. had been placed in custody of CPS. David was still under probation in California for his felony conviction when he found out that CPS had custody of D.F. Because

4

there was some confusion regarding whether David was D.F.'s father, Gillinger asked David to submit to a paternity test. Although David said that he would submit to the test, he had failed to do so as of the time of trial. However, David acknowledged in open court that he was D.F.'s father.

Gillinger testified that she also mentioned to David that "services" needed to be completed but that she never specifically told David about the service plan that she had created for him. David testified, however, that Gillinger never mentioned services during their conversations. Gillinger mentioned that she talked to David a second time in August, but she did not state what was discussed during that communication.

After the two initial phone conversations between Gillinger and David, Gillinger attempted to call David in September 2006 but learned at that time that David no longer had the same phone number. David testified that while his phone number may have changed, his physical address remained the same and that mail sent to his California address was being forwarded to North Carolina, where he has been since December 2006. Gillinger never spoke with David again until one week before trial in February 2007, when Gillinger finally made contact with him by phone in North Carolina. David stated that he quit calling

5

Gillinger because she failed to provide him with paperwork that he had requested.[3]

On August 21, 2006, TDFPS amended its petition to terminate parental rights to include David as the presumed father. In September 2006, after he found out that CPS had taken custody of D.F., David was charged with possession of methamphetamine in California, and at the time of trial, there was an active arrest warrant out for David concerning this offense. In October 2006, CPS placed D.F. with Pamela F., a dual-licensed foster parent. In December 2006, after David finished serving his probation for the felony conviction in California, he traveled by bus back to North Carolina to visit his other three children. Although David traveled through Texas on his way to North Carolina, he failed to make any contact with D.F., who was living in Texas at the time.

At the bench trial, based on section 161.001(2) of the Texas Family Code, the trial court found that it was in the best interest of D.F. to terminate the parental rights of Yvonne, Michael, and David. *See* TEX. FAM. CODE ANN.

---

[3] David testified that he called Gillinger in September 2006 to discuss the date of the hearing for this case, which conflicts with Gillinger's testimony stating that the two talked twice in August, but not in September. It is not clear from the record whether this second phone call that David testified to is the same second phone call that Gillinger referred to as being made in August. In any event, after the two initial conversations, Gillinger attempted to call David in September with no success.

§ 161.001(2) (Vernon Supp. 2007). Additionally, with respect to David, the trial court made the following findings by clear and convincing evidence based on section 161.001(1):

- David knowingly placed or knowingly allowed D.F. to remain in conditions or surroundings that endangered the physical or emotional well-being of D.F;

- David engaged in conduct or knowingly placed D.F. with persons who engaged in conduct that endangered the physical or emotional well-being of D.F.;

- David constructively abandoned D.F., who has been in the permanent or temporary managing conservatorship of TDFPS or an authorized agency for not less than six months and: (1) TDFPS or an authorized agency made reasonable efforts to return D.F. to David, (2) David did not regularly visit or maintain significant contact with D.F.; and (3) David demonstrated an inability to provide D.F. with a safe environment.

David now appeals the trial court's findings under subsections (1) and (2) of section 161.001 of the Texas Family Code.

### III. WAIVER

TDFPS argues that David has waived his sufficiency arguments because he failed to file a statement of points with the trial court. *See* TEX. FAM. CODE ANN. § 263.405(i) (Vernon Supp. 2007). TDFPS further argues that David's motion for new trial does not constitute a valid statement of points because it is too vague to satisfy the requirement that the statement of points be "sufficiently specific" to preserve error for appeal. *See id*. However, in a recent en banc decision, this court held that family code section 263.405(i) is void as a violation of the separation of powers provision of the Texas Constitution. *See In re D.W.*, No. 02-06-00191-CV, 2008 WL 467328, at *12 (Tex. App.—Fort Worth Feb. 19, 2008, no pet. h.). We are bound to follow our own precedent, so we hold that David's sufficiency arguments are not waived and proceed to the merits of David's appeal.

### IV. TERMINATION OF PARENTAL RIGHTS

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional

8

underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

## A. Standard of Review

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have

10

disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the judgment. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we

11

reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

## B.    Conduct Findings

In his first point, David complains that the evidence is legally insufficient to support the trial court's three findings under section 161.001(1)(D), (E), and (N) of the Texas Family Code.[4]

We first consider whether the evidence was legally sufficient to support the finding that David engaged in conduct or knowingly placed D.F. with persons who engaged in conduct that endangered the physical or emotional well-being of D.F. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).  TDFPS argues that while imprisonment, alone, is insufficient to demonstrate endangerment, it is a factor to be considered along with other evidence regarding David's past drug use, his three convictions, and his current arrest warrant for possession of methamphetamine to demonstrate a continuing course of conduct that has had the effect of endangering D.F.'s well-being. David argues, however, that

---

[4] In his motion for new trial and in his brief on appeal, David phrases his first point as a challenge to the legal sufficiency of evidence regarding the best interest finding under section 161.001(2) of the Texas Family Code. However, in the argument section of his brief under this first point, David actually challenges the legal sufficiency of the conduct findings under section 161.001(1).

the evidence regarding his history of criminal conduct and his 180 days of imprisonment is insufficient to support a finding that he endangered D.F.'s well-being because it does no more than show that David left D.F. "adrift in the world." *See In re T.H.*, 131 S.W.3d 598, 604 (Tex. App.—Texarkana 2004, pet. denied) (rejecting argument that mere imprisonment or the commission of an act that results in imprisonment leaves the child "adrift in the world," and thus, constitutes endangerment.).

"Endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *Boyd*, 727 S.W.2d at 533. The term means to expose to loss or injury, to jeopardize. *Id*. The relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.). However, it is not necessary that the conduct

be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *See id*.; *R.W.*, 129 S.W.3d at 738.

Mere imprisonment, alone, does not constitute a course of conduct that endangers the emotional or physical well-being of a child, but it is a factor to be considered in the determination. *See Boyd*, 727 S.W.2d at 533–34. As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *Id*. Further, evidence of an inappropriate sexual relationship with a minor may also be considered in determining if the parent engaged in conduct that endangered the emotional or physical well-being of the child. *Id*.

While the evidence does not illustrate the daily activities that David and D.F. shared together, David's testimony provides the strongest context for their interaction. David stated that for the first three years, he and D.F. were together nearly every day. He also said that after the first three years, Yvonne ended David's visitation with D.F. David last saw D.F. in August 2004.

We first look to David's criminal history to determine whether it supports the endangerment finding. The evidence shows that in 2003, David was

14

convicted of possession of stolen goods, and in either 2003 or 2004, he was convicted for the assault of his sister. David testified that his sister hit him with a baseball bat and that he pushed her away; he could not recall whether his sister was also convicted of assault. David was imprisoned for fifty-five days following the assault conviction. Both of these crimes were committed during or around the time David and D.F. maintained substantial contact; however, while in California, David was convicted of the felony offense of unlawful sex with a minor. The minor was a seventeen-year-old girl who he claimed lied to him about her age. David testified that he "took a plea" on the charge so that he could work and pay child support.

David served probation for nearly two years for the unlawful sex with a minor conviction, which precluded him from leaving California and visiting D.F. David stated that he served seventy-five days in jail by choice to shorten the total probation period. While the evidence does not specifically show how much time David served for each offense, David testified that since 2004, he has served a total of 180 days in prison.

David admitted at trial that he had an active warrant out for his arrest in California for possession of methamphetamine, which occurred in September 2006, after he found out that CPS had custody of D.F. David stated that if he were to be convicted of this offense, it would be his second felony offense in

15

California. He asserted that he was neither using nor selling methamphetamine but that the police charged him with the offense because his girlfriend's methamphetamine pipe was on his side of the vehicle.

Although imprisonment is insufficient, by itself, to support an endangerment finding, the court was entitled to consider David's 180 days' imprisonment and his probation in its determination. Further, though not all of David's misconduct occurred during his time with D.F., the court could have determined that his actions, which began in North Carolina and continued through his time in California and after he found out about D.F.'s situation with CPS, constituted a deliberate course of conduct that had the effect of endangering D.F.'s well-being. *See R.W.*, 129 S.W.3d at 738, 743–44. (holding that the appellant endangered the child under 161.001(1)(E) based mainly on conduct that occurred before the child's birth and despite the fact that he never had custody of the child at any time other than one hour of supervised visitation per week).

The court could have also considered the evidence of David's admitted past drug use around the time he was connected with D.F. to support its finding. When asked whether he was using drugs during a specific period of time in those first three years of contact with D.F., David said that he "probably was." David stated that he last used drugs three years ago—around

16

2004—which was the last time he spent with D.F. Gillinger testified that part of the reason she concluded that it was in D.F.'s best interest to terminate the parental rights of all three parents was due to drug use. Later, when asked whether she had any personal knowledge that David abused drugs, Gillinger said, "other than records from North Carolina for CPS, no." The court's function, as the trier of fact, is to judge the credibility of the witnesses, assign the weight to be given their testimony, and resolve any conflicts or inconsistencies in the testimony. *R.W.*, 129 S.W.3d at 742. Thus, the court was entitled to believe that David had not quit using drugs in light of his active arrest warrant in California for methamphetamine possession. *See id*. at 742–43.

We also find it pertinent that David failed to act when informed of CPS's involvement with D.F. First, Michael's mother informed David that a social service organization in Texas was investigating Yvonne and D.F., and David responded by attempting to call Yvonne's mother and making one phone call to Dallas before giving up completely on any search for D.F. David points to no evidence that would suggest that he did anything more to check on D.F.'s welfare. Indeed, when asked what other efforts he had made to locate D.F. following the conversation with Michael's mother, he said, "none." Morever,

17

David found out in August 2006[5] that CPS had taken custody of D.F., and since that time, he has failed to keep in touch with Gillinger to inform CPS of his whereabouts, which Gillinger claimed precluded her from implementing the service plan for David. David's failure to act when his daughter's welfare was clearly in jeopardy is evidence that demonstrates a conscious omission to act, which has the effect of endangering D.F. by subjecting her further to a life of instability.

The evidence presented demonstrates a deliberate course of conduct from which a reasonable trier of fact could have found an endangerment to D.F.'s emotional and physical well-being. Specifically, the court could have relied on evidence presented with respect to David's failure to act, drug use, physical violence toward a family member, imprisonment, probation, and sexual misconduct with a minor to support its finding that David's actions subjected D.F. to a life of uncertainty and instability. Thus, when viewing all the evidence in the light most favorable to the judgment, we hold that the evidence was legally sufficient to support the court's finding that David has engaged in a deliberate course of conduct that has endangered D.F.'s well-being.

Because we have found the evidence legally sufficient to support the trial

---

[5] Gillinger testified that David was aware that D.F. was in foster care in spring of 2006, but David testified that he found out that D.F. was in care of CPS in August 2006, when Gillinger first contacted him.

court's finding under subsection (E), we need not address David's complaint regarding the sufficiency of the findings under subsections (D) and (N). *See R.W.*, 129 S.W.3d at 744 (holding that only one finding under section 161.001(1) is necessary to support a judgment of termination).

## C.    Best Interest Finding

In his second point, David argues that the evidence is factually insufficient to support the finding that the termination of his parental rights was in D.F.'s best interest. Although David at one time said that he wanted to care for D.F., he has now requested that D.F. live with her godmother, Shelly, in North Carolina. David argues that it is in D.F.'s best interest to live with Shelly because she would be close to her siblings, who live in Wake Forest, North Carolina, approximately twenty minutes away from Shelly's house.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3)the emotional and physical danger to the child now and in the future; (4) the

parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

With respect to the first factor, D.F. did not testify at trial, but Gillinger testified that every time she and D.F. talked, D.F. had positive things to say about her foster family. Most importantly, D.F. told Gillinger not to take her away from her foster home. Gillinger also stated that during their conversations, D.F. talked about her older sister with the foster family, her involvement with school basketball, her success in school, and having new

20

friends. Pamela testified that D.F. signs her schoolwork with her foster surname and that her school teachers also refer to her by that name. D.F. also refers to Pamela as her "mommy."

As for the third factor, the court was entitled to conclude, based on all the evidence set forth above regarding David's criminal history, drug use, incarceration, and general lack of interest in D.F.'s life, that D.F.'s emotional well-being in the future is at risk.

With respect to the fifth factor, Gillinger testified that she had set up a service plan for David but that she had not implemented the plan because she had limited contact with David.

Regarding the sixth and seventh factors, CPS plans to have Pamela adopt D.F. Pamela testified that adopting D.F. is also her intention, pending the outcome of the case. Pamela lives with her husband, their 12-year-old son, and now, D.F. Pamela and her husband have three other adult children that live out of the house. The evidence demonstrates that during her time with Pamela, D.F. has both bonded with the family and successfully acclimated to her new life. William Allanach, a Child Advocates volunteer, testified that on his visits to see D.F. with her new foster family, he noticed that their relationship seemed to be very loving and supportive, referencing many of the activities D.F. has enjoyed with her new family, such as riding bicycles, playing basketball, and

21

baking cookies. Gillinger testified that she noticed a strong level of affection between D.F. and her new foster family and went on to state that she did not observe that same level of affection between D.F. and her previous foster family.

David, on the other hand, has proposed that D.F. leave her foster family and move in with Shelly in North Carolina, whom D.F., at the time of trial, had not seen in over two years. Shelly lives in a four-bedroom home with her husband and six children; D.F. would be the seventh child in the house. David's main argument for placing D.F. with Shelly, is that she would be closer to her siblings, whom she had not seen in almost two years at the time of trial. There was a considerable amount of testimony concerning Shelly and her withdrawal from a previous home study initiated by North Carolina CPS. Gillinger testified that North Carolina CPS denied the home study after it had made several attempts to contact Shelly and because Shelly failed to participate in foster parenting classes. Shelly testified that her home study was withdrawn, as opposed to being denied by CPS, because she wanted to give Yvonne's mother a chance to take custody of D.F. Shelly also mentioned in her reasoning for withdrawing from the home study that her daughter was expecting a baby and that Shelly felt as though she was the only one who could be there with her at that time. Shelly's eighteen-year-old daughter and

22

that daughter's nine-month-old baby whom Shelly referred to are both currently living in Shelly's house.

Regarding the eighth and ninth factors, there is ample evidence that demonstrates David's lack of interest in visiting D.F, knowing her whereabouts, or generally participating in her life. David admitted that he did nothing more than make two phone calls when he first found out that Yvonne and D.F. were being investigated in either October or November 2005. Also, since either spring of 2006 or August 2006, when he found out that D.F. was in foster care, David has never visited D.F. or asked to visit D.F.; however, until late 2006, David was precluded by the terms of his probation from leaving the state of California. David also admitted that April 8, 2005 was the last time he sent any financial support to Yvonne for D.F. David continued, however, to give money to Yvonne's mother for the other three children. David testified that he stopped paying child support for D.F. because he did not know where Yvonne was and that Yvonne did not want the money anyway. Additionally, the one time that David traveled by bus through Texas on his way from California to North Carolina, he failed to make any contact at all with D.F., who was living in Texas at the time. He said that it "never crossed [his] mind" to call and ask to see D.F. and that he "figured it was just waiting to go to court." Finally, David agreed on cross-examination that it would be okay if his rights were

23

terminated as long as D.F. was sent to live with Shelly and that he would not visit D.F. if asked not to do so by the trial court.

Having carefully reviewed the record and considering the evidence supporting the *Holley* factors, we hold that the evidence is factually sufficient to support the trial court's best interest finding. The trial court could have formed a firm conviction or belief, based on the evidence set forth above, that terminating David's parental rights was in D.F.'s best interest. Accordingly, we overrule David's second point.

## V. CONCLUSION

Having overruled both of David's points, we affirm the trial court's judgment.

PER CURIAM

PANEL F: HOLMAN, WALKER, and MCCOY, JJ.

DELIVERED: March 27, 2008

24