# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00727-CV

**Loretta Jones, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-FM-06-002820, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellant Loretta Jones appeals from the trial court's final decree terminating her rights to her three children. The court's order set out the jury's unanimous verdict that termination was in the children's best interest and that appellant knowingly placed or allowed the children to remain in dangerous surroundings or conditions, engaged in conduct that endangered the children or knowingly placed them with people who engaged in such conduct, or failed to comply with provisions of a court order setting out actions necessary for her to regain custody of the children. Appellant contends that the evidence is legally and factually insufficient to support the jury's findings of best interest or the grounds for termination. We affirm the trial court's decree.

## Standard of Review

To terminate a parent's rights to their children, which are of constitutional dimension, *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1994), the fact-finder must find clear and convincing

evidence that (1) the parent has engaged in the conduct set out as statutory grounds for termination and (2) termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002); *see* Tex. Fam. Code Ann. § 161.001 (West 2008) (statutory grounds for termination). "Clear and convincing evidence" is the level of proof required to produce in the fact-finder's mind a firm conviction or belief that the Department's allegations are true. *C.H.*, 89 S.W.3d at 23. In reviewing a best-interest determination, we consider: the child's wishes, his emotional and physical needs now and in the future, emotional or physical danger posed to the child now and in the future, the parenting skills of those seeking custody, programs available to assist those seeking custody to promote the child's best interest, various plans for the child's future, the stability of the home or proposed placement, any conduct by the parent that might show that the existing parent-child relationship is improper or harmful, and any excuse for that conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

We review legal sufficiency by considering all of the evidence, including evidence that does not support the finding, in the light most favorable to the fact-finder's determination, asking whether a reasonable fact-finder could have formed a firm conviction or belief that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the fact-finder "resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* Issues related to witness credibility, meaning questions that turn on a witness's appearance or demeanor, are left to the fact-finder's determination as long as its determination is not unreasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (quoting *Southwestern Bell Tel. Co. v. Garza*,

164 S.W.3d 607, 625 (Tex. 2004)).  If we determine that the evidence is legally sufficient, we review factual sufficiency.  Evidence will only be held to be factually insufficient if "a reasonable factfinder could not have resolved that disputed evidence in favor of its finding" and instead, considering the record as a whole, "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *J.F.C.*, 96 S.W.3d at 266.  If we determine that the evidence is factually insufficient, we must "detail in [our] opinion why [we have] concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *Id.* at 266-67.

**Factual Summary**

This proceeding involves appellant's parental rights to her daughter, J.R., and her two sons, J.F. and J.D.[1]  At the time of trial in November 2007, J.R. was eleven years old, J.F. was nine, and J.D. was eight; J.R. was placed in one foster home, and J.F. and J.D. were placed together in a separate home.  Between March 1996 and June 2006, the Department received about twenty referrals related to appellant's children alleging negligent supervision, medical and physical neglect, and physical abuse.  In April and May 2006, the Department received referrals alleging that eight-year-old J.F. and seven-year-old J.D. were being medically neglected;[2] that the family was homeless; that appellant and John Jones used drugs and were violent with each other in front of the children; and that appellant verbally abused the children.  The children were removed from

---

[1] The children's father and appellant's ex-husband, John Jones, signed an affidavit of relinquishment, and his parental rights were also terminated.  He is not a party to this appeal.

[2] J.F.'s teachers were concerned that he might be diabetic, but appellant testified that she had him tested for diabetes and that the results were negative.

3

appellant's care on June 6, 2006, when their aunt, Evangeline Mitchell Taylor, refused to continue caring for them. Appellant had been in jail until early June and had left the children in Taylor's care. When appellant was released, she stayed one or two nights at Taylor's house but then fought with Taylor because appellant kept going out at night, leaving Taylor to care for the children. Taylor said that the children could live with her only if appellant was there to care for them, but that appellant had been going out every night and leaving the children with Taylor.

Caseworker Kristen Knauf started working with the family in July 2006 and testified appellant was frequently twenty to thirty minutes late for hour-long visitations and on more than one occasion missed a scheduled visitation altogether, which greatly upset the children. Knauf also said when appellant had visitations, Knauf frequently had to instruct appellant not to discuss the case with the children, blame their removal on the Department, or make promises about how she would soon regain custody. Knauf and her supervisor stopped allowing appellant's visitations after the children's therapists said they were concerned about the children's emotional well-being and recommended family therapy instead. Appellant and the children began family therapy in June 2007, but therapy was halted after appellant's second session, when she learned that the boys were on medication and told them that "CPS thought they were crazy" and that they "didn't need to take their medication." After that session, the children "reacted very badly," and their therapists told Knauf that they "felt like they were doing damage control because of this one family therapy session."

Knauf testified that appellant did not maintain stable employment or housing, as required by the Department. Knauf said that appellant did not acknowledge that she needed the services required by the Department and "seemed to be in denial" about the reasons for the

4

children's removal. Appellant admitted to Knauf that she had dealt drugs but said she "felt like it didn't affect her children" and told Knauf that "CPS is driving her back to dealing drugs." Knauf said appellant "would get very verbally aggressive. She would tell me that she didn't want to talk to me. She refused to have meetings with the Department." Appellant was rejected from one drug treatment program because she minimized her drug use, so the Department referred her to a second, more lenient program. Appellant completed an evaluation and began that program in July 2007, more than one year after the children's removal, but was soon kicked out for using marihuana. She was allowed to re-enroll in August and completed the program several weeks before the final hearing.

Knauf testified that appellant was terminated from individual therapy after she failed to attend the first four scheduled sessions but later found another psychotherapist who she had been seeing regularly since February 2007. Appellant was ordered to take drug tests but had complied with only five of fifteen test requests made between June 2006 and August 2007, testing positive for marihuana in three of those five tests. In addition to completing the drug treatment program, appellant completed psychological and psychiatric evaluations, anger management classes, and a protective parenting class, but Knauf testified that she was told that appellant "remained superficial during the group therapy process" of the parenting class.

Knauf testified that although the children's progress had been rocky at times, they were doing well and had greatly improved their behavior since living in their current foster homes. Knauf testified, "I don't think that [appellant] can give these kids the home that they need. She's been very unstable herself throughout the case, moving from house to house. She's shown that she

5

cannot control her anger and her temper. . . . I'm concerned about these kids going home and her not being able to control her temper with them. Her criminal history is endangering to these kids and . . . them seeing these behaviors and thinking that it's normal." Knauf thought that it was in the children's best interest for appellant's rights to be terminated and that "it would be seriously harmful to them to be returned to their mother." Knauf was asked whether appellant's recent completion of drug treatment changed her opinion about appellant's fitness as a parent, and she answered, "No. . . . She's had anger management issues for a very long time. And I'm not sure that in such a short period of time that could be adequately addressed. Drug history, we like to see an extended period of sobriety, because relapse is part of recovery and most people will relapse."

Dr. William Dubin testified that he conducted appellant's psychological evaluation in October 2006 and concluded that appellant had antisocial personality disorder and a "parasitic lifestyle." Dubin testified that appellant has a normal intellect and suffers from bipolar disorder. He said that appellant's bipolar disorder would not "disqualify her from being a good parent. But that, in combination with other things, is also [a] concern. Moreover, one other issue is that people with bipolar disorder tend to be impulsive and it's harder for them to control their drug use." Dubin testified that J.F. is a very difficult, demanding child who "requires a lot of energy on the part of the parent. And [appellant's] part, she often gets depressed and doesn't have the energy and wherewithal to provide all that's needed. And there does seem to be some resentment as a result and it's possible this may contribute to some of the medical neglect that's described in the record." Dubin testified that many of his concerns about appellant's fitness as a parent were related to drug abuse. He also said that appellant was cooperative and honest during the evaluation and that her decision to stop

6

using drugs during her pregnancies was a positive sign that she could put her child's needs ahead of her own if necessary. He said that appellant's compliance with many of the Department's requirements was a "good sign," but said that "there's a high rate of relapse. So the fact that somebody goes through treatment is a very good sign. The likelihood that it's going to do good, that's questionable. . . . [I]t has to be put in context of, you know, the long range issue of substance abusers who go through periods of sobriety and then relapse."

Dr. Tania Glenn, a clinical therapist who had worked with J.F. and J.D. since February 2007, testified that J.F. "displays behaviors of severe neglect," is "very aggressive," has "very violent, aggressive episodes," "extreme outbursts," and "severe tantrums," has "been suicidal twice," and provokes his siblings. J.F. told Glenn that he had "been exposed to a great deal of violence," had been physically abused, had witnessed domestic violence, and had "a very, very chaotic childhood." Glenn testified that J.D. has the same issues as J.F. with the addition of being "very manipulative and he is very sexual with women." Glenn testified that she made "very, very good progress" with the boys until June, when they had two family therapy sessions with their mother "and we went back to ground zero." After appellant told the children that they did not need medication, J.D. refused to take his medication, had a "full-blown flashback," and became "extremely suicidal," taking a knife from the kitchen and requiring restraint. Although the rest of the summer after the Department halted family therapy was "very chaotic and very stressful," Glenn saw progress again beginning in September until the children saw appellant at a hearing about two weeks before trial, after which the children "backslid back to—back to some pretty hostile and aggressive behaviors," including J.D. stating "that he was going to rape his foster brother's sister."

7

Glenn testified that the boys have told her, "[W]e would like to be with our mother as long as everything is exactly the way it is here at our foster home. But if it can't be that, they want to stay with [their foster mother]." Glenn testified that the boys "equate violence with love" and hoped that she could help them change that view through several years of therapy. She said that their current foster home is stable, after one failed attempt at placing them with their sister. She said the children were not "anywhere near being able to be with their mother." Glenn thought appellant's parental rights "need to be terminated," saying, "I think had the mother set out on the course, had hit the ground running and had worked really hard for the year, year and a half that she had, I think maybe there would have been a small chance that she could have pulled it off given the level of emotional disturbance that these boys have. It's just too little too late. There's just no way."

Sharon Canipe testified that she had been J.R.'s therapist for more than one year and that she had worked with J.D. and J.F. until they were moved into their new foster home; there were more behavior problems when the three children lived together. Canipe testified that the children acted as if they had been neglected and left to fend for themselves, displaying "[a]ggression, cursing, fighting, some fearfulness, anger, disrespect, defiance." Canipe had worked with J.R. on "[s]ome pretty severe" hygiene issues and said that J.R. had made progress but that Canipe wanted her to "come to an acceptance of what, you know, her situation was and, you know, a good sense of herself. I'd like to see her hygiene improved. I'd like to see her be able to acknowledge and identify her feelings." J.R.'s foster mother told Canipe that in the month before trial, J.R.'s hygiene had worsened and her grades had fallen. Canipe said, "I think she needs an answer. I think she needs to know what's going to happen." Although J.R. hoped to be reunited with appellant, she had settled

into her foster family and told Canipe that "she would just stay there if she can't go home." Canipe testified that it would be harmful to J.R. to return to a chaotic and unstructured environment.

One of J.F.'s teachers testified that J.F. often arrived late to school and that his "clothes were too small, sometimes dirty. He was hungry always. And sometimes talked about not eating at night, not eating at home. . . . He would sleep a lot." J.F. had "a high average, if not higher IQ" but was significantly behind in reading, which the teacher attributed to "home environment and lack of educational opportunities." The children's principal testified that appellant often brought the children to school late, growing very angry if told they were too late to have breakfast, and was often very late in picking the children up. In November 2005, appellant arrived more than forty-five minutes late and got extremely angry when she was admonished about being on time. Appellant became so threatening that school personnel called the police, who took appellant into custody; she was charged with drug possession when the police found crack cocaine when they searched her.

J.R.'s foster mother stated that she would keep J.R. until she is adopted or reaches adulthood and that J.R.'s hygiene had improved and that J.R. had been doing "[a] lot better" and seemed relieved since her brothers were placed in a separate home. The boys' foster mother also testified that she planned to keep the boys until they were adopted or reached adulthood. She said that the boys' behavior and hygiene had improved through the consistent imposition of rules and a steady routine. J.D. had made the honor roll, and J.F.'s reading ability had improved with regular practice. The social worker who led appellant's anger-management class, which appellant completed the week before the final hearing, testified that appellant had worked on identifying issues that caused problems in the past but had only recently acknowledged her anger problems and still needed

9

"to continue to work on herself and her own stability let alone have other stressors added by other people." The children's court-appointed special advocate thought termination and continued placement in their foster homes was in the children's best interest. The children told the advocate that they wanted to go back to appellant but if that was not possible, they hoped to stay in their foster homes, where the advocate said they had made slow progress. The advocate had seen improvements in appellant's behavior during recent interactions but recommended termination because appellant "didn't appear to fully engage in services" and was not capable of meeting the children's needs.

Cody Stanley, the family's caseworker for the three months leading up to the final hearing, testified that appellant had not shown she could be a good parent because "even after completing services, there hasn't been enough time for her to demonstrate that she can apply the knowledge that she's gained from those classes. And secondly, I get the impression from her that she only engages on a very shallow level and that she's not really comprehending how this entire case and her past actions have affected her children." Stanley believed it would be harmful for the children to be returned to appellant's care because "they've been exposed to so much and it's so obvious. And they don't even comprehend that anything was wrong with the way things were. And I think that's very disturbing for a child to think that it's okay that they don't have food to eat or that it's okay if they don't have a safe place to stay or that it's okay for violence to be so prevalent." Stanley felt that appellant did not fully understand her children's needs or how her lifestyle endangered the children and he did not think appellant was capable of safely parenting her children at the time of trial. Stanley testified that the children were doing well in their foster homes and that he believed they would continue to thrive in those placements.

Appellant testified that she had been convicted three times for assault and that she had been arrested a total of eighteen times for assault, assault on family members, credit card abuse, drug possession, tickets, and criminal trespass. Appellant admitted that she sold marihuana and crack cocaine for "a couple of years," up until July 2006, and that she was arrested and charged with possession of crack cocaine after the fight she had with her children's principal. Appellant was released on bond; arrested in May 2006 for credit card abuse while out on bond; released again on bond in late May or early June 2006; arrested in July 2006 for drug possession after the police found marihuana, crack cocaine, and ecstasy in her possession; and was convicted of selling crack cocaine, which is a second-degree felony, incarcerated for about two months, and placed on six years' probation. At the time of trial, appellant had been out of jail for about one and one-half years. Appellant testified that although she sold crack cocaine, she never used it. She admitted that she had used ecstasy several times and that she used marihuana regularly between 1996 and late August 2007. She testified that she was still in recovery from her marihuana "problem," but also said she did not believe her drug use interfered with her parenting abilities. She said she stopped using it because it was too expensive, she was on felony probation, and the Department had required her to stop. Appellant also testified she had been diagnosed as suffering from manic depression and bipolar and antisocial personality disorders, was taking medication to treat her mental conditions, and had tried to kill herself in 1994 and again in about 1997.

Appellant married John Jones in 1996, and they divorced in March 2004. Appellant denied that her children were ever physically abused but admitted that she and John Jones were often violent with each other when the children were present. Appellant also testified that she got involved

11

in another violent relationship after breaking up with Jones and that the children were sometimes present for those incidents. At the time of the final hearing, appellant was involved with Manuel Jusino, who was at the time incarcerated for drug possession, had served time for robbery, and had sold crack cocaine. She had not written to Jusino in two months and, although they had discussed marriage, was unsure whether she still wanted to marry him. At the time of trial, appellant was living with her uncle, after having lived with her mother for several months following her release from jail. She testified that she was employed at Sonic Drive-In, where she had worked for about a year.

Appellant admitted that J.R. has hygiene problems and had not been bathing or wearing deodorant regularly. She testified that although he is very bright, J.F. has special needs and has trouble reading. She also said that J.F. was diagnosed with posttraumatic stress disorder and attention deficit hyperactivity disorder and needs asthma medication. She testified that both boys have problems with aggression, saying, "[T]hey may be acting just like their dad. They've seen us fighting and arguing and seen different—there's a lot of stuff they've seen."

Appellant admitted that she was frequently twenty or thirty minutes late for her visitations, at least once arrived an hour late and missed the visit altogether, and failed to arrive at least twice. She explained that she did not have a car and that, when she was able to borrow a car or find someone to give her ride, she still had to find gas money and deal with traffic. Appellant was asked why she waited so long before engaging in the services required by the Department, and she said that she started after her August release from jail and that at the time, "I was frustrated. I was distraught. I was angry. I was—my kids weren't there. They are my life and they've always been there. So they weren't there so I was very angry about the whole situation." Appellant said her

12

children were probably "[s]cared, afraid, worried" about the violence they witnessed or when she failed to pick them up or arrive for visitations. Asked whether the children can trust that she has changed, she said, "They can, yes. They believe in me. They have faith in not just me, but they believe that I can. I know that I can."

John Williams, the psychotherapist appellant had been seeing since February 2007, testified that appellant suffered considerable trauma growing up and that when she started therapy, she was angry and shifted the blame away from her. Appellant had since made an effort to change, commit to therapy, and get further education. Williams testified that appellant was in "the middle phase" of therapy and that she had made good progress but still "has a lot of work to do." Williams said, "Her participation was good. As far as prognosis, I think [appellant's] prognosis is guarded." He testified that she knew she had "stuff" to work on, such as "her relationship issues, her economic situation, her self-esteem, her depression," and was willing to do the necessary work. Williams believed that therapy was helping appellant "find some resiliency within herself." Williams said he thought appellant "started to have a real turning point around the middle of July," when she "was starting to take this serious[ly]." Finally, employees of appellant's drug treatment program testified that when appellant returned after being kicked out, she "participated in group, showed a lot more insight and managed to graduate successfully," and that she was sincere and "highly active" in her participation in the program and therapy.

## Discussion

Appellant asserts that the evidence is both legally and factually insufficient to support a finding that she knowingly placed the children or allowed them to remain in dangerous

13

surroundings or conditions, engaged in conduct that endangered the children or knowingly placed them with people who engaged in such conduct, or failed to comply with provisions of a court order setting out actions necessary for her to regain custody of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O). Appellant contends that although her children saw domestic violence growing up, they were never injured. She further asserts that although the family struggled with poverty and homelessness, she cared for the children to the best of her ability, and argues that her criminal record is insufficient to terminate her rights. *See In re T.H.*, 131 S.W.3d 598, 604 (Tex. App.—Texarkana 2004, pet. denied). She further asserts that her marihuana addiction, when viewed in light of her successful completion of a drug treatment program and two negative drug tests, should not be considered a course of conduct that endangered the children. Finally, she points to the following as weighing against the jury's findings that she endangered her children or placed them in dangerous situations: having obtained and kept a job, finding housing with her uncle, completing psychological and psychiatric evaluations, completion of parenting classes, attendance of individual therapy sessions, and completion of anger management classes.

When evaluating whether a parent placed her child in conditions that endangered the child, "we look to see if the environment itself poses a danger to the child's physical or emotional well-being." *T.H.*, 131 S.W.3d at 602. Further, while section 161.001(1)(E) requires evidence that a parent's "course of conduct" endangered the child, the parent's actions or failures to act need not have been specifically directed at the child or have actually injured the child or even constituted a concrete threat of injury to the child. *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). Instead, "the statute is satisfied by showing that parental conduct simply jeopardized the child's physical or emotional well-being." *Id.* at 351.

14

The record reflects that Appellant made recent significant progress after years of drug use and sporadic employment. She had been employed for about one year, found stable housing with her uncle, completed a drug treatment program, and tested negative for drugs about one month after completion. However, that progress, no matter how laudable, does not erase the fact that the children were subjected to a "chaotic" and violent environment. They witnessed domestic abuse between their parents, often were present when appellant lost her temper and yelled at other people, were sometimes homeless and living in vacant houses or motels, came to school late and hungry, lacked clothes that fit, and were left alone while very young. Numerous witnesses testified that the children have serious behavior problems stemming from neglect and a traumatic environment. *See T.H.*, 131 S.W.3d at 602; *M.J.M.L.*, 31 S.W.3d at 350-51. In addition, appellant did not seem to fully engage in services until a year or more after the children were removed and, until shortly before trial, appellant failed to comply with many of the Department's requests for drug tests. *See* Tex. Fam. Code Ann. § 161.001(1)(O). Based on this record, we cannot hold that the evidence is such that the jury could not have developed a firm conviction or belief that appellant placed the children in conditions that endangered them, engaged in conduct that endangered them, or failed to comply with requirements of a court order specifying actions necessary to regain custody of the children. *See J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 23. The evidence is legally and factually sufficient to support the jury's findings that appellant placed the children in an environment that endangered their well-being, engaged in conduct that endangered them, and failed to comply with a court order setting out necessary actions to regain custody. We overrule issues one, two, three, five, six, and seven.

In her fourth and eighth issues, appellant asserts that the evidence is legally and factually insufficient to support the jury's finding that termination was in the children's best interest.

She notes that the children all expressed that they loved appellant and hoped to be returned to her care, that she had obtained and kept a job and stable housing, and that she had completed parenting, protective parenting, and anger management classes. She also notes that the children had been split up and that they were unlikely to be adopted because of their age and race.

There is no dispute that the children told their therapists and other adults that they loved appellant and hoped to be reunited with her if conditions improved. However, they also expressed fear of returning to the same kind of chaotic environment from which they were removed and said that they would prefer to stay in their foster homes if appellant could not attain and maintain stability. Further, the evidence also shows that the children were making progress in school and in their behavior since being removed from her care and being placed into two different foster homes, and that the children had serious relapses in behavior, hygiene, and school performance after visits with appellant. All of the professionals involved with the children—their advocate, caseworkers, and therapists—testified that the children had improved in their foster homes and that they did not believe that appellant had shown she was capable of being a safe and stable parent. There was testimony that the boys in particular had special needs as far as learning to control their behavior and that appellant seemed to downplay the problems facing the children. Both foster mothers testified that although they did not intend to adopt the children, they were committed to keeping them until they were adopted or until they reached adulthood. Finally, we cannot ignore that appellant's new-found stability is, unfortunately, unproven and that appellant's therapist opined that her prognosis was "guarded" and that she still had significant work to do. On this record, we hold that the evidence is legally and factually sufficient to support a finding that termination is in the children's best interest. *See Holley*, 544 S.W.2d at 372. We overrule appellant's fourth and eighth issues.

## Conclusion

We have reviewed the record and hold that the evidence is both legally and factually sufficient to support the jury's findings and verdict.  Having overruled appellant's issues on appeal, we affirm the trial court's termination order.

_____

David Puryear,  Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed:   June 4, 2009