# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-25-00750-CV

---

**C. R. F., Appellant**

v.

**Texas Department of Family and Protective Services, Appellee**

---

### FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
### NO. 2024V-025, THE HONORABLE JEFF R. STEINHAUSER, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed an order terminating the parental rights of C.R.F. ("Mother") to her children "Jeff," "Eric," and "Frank."[1]  Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings of statutory grounds for termination and its best-interest findings.  *See* Tex. Fam. Code §§ 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (b)(2) (best interest of child).  Mother also challenges the legal sufficiency of the evidence supporting the trial court's findings that the Department made reasonable efforts toward reunification and that appointing the Department as the children's permanent managing conservator is in their best interest.  For the following reasons, we will affirm the trial court's order.

---

[1] We refer to appellant by her initials or as Mother, to the children by aliases, and to other individuals by their relationships to the child or to Mother.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  In this case, the termination order also terminated the parental rights of Jeff's father, Eric's father, and Frank's father, but none of the fathers have appealed.

## BACKGROUND

On January 30, 2024, Jason Fowler, a Fayette County Sheriff's Office Deputy, was on a routine patrol. At 1:06 a.m., Deputy Fowler noticed a vehicle parked in the parking lot of a closed business. Deputy Fowler viewed the vehicle as "suspicious" because all the windows of the car were covered with blankets and quilts and it had a temporary license plate from New Mexico. Deputy Fowler knocked on the vehicle's window, Mother lowered the window, and Deputy Fowler asked her what was going on and why she was there. Mother told him that she was stopping to rest and was on her way to Clute, Texas, to visit her brother who had just had a child. Deputy Fowler was informed by his dispatch office that Mother had two outstanding felony warrants; one from Brazoria County, Texas, for assault family violence and one from New Mexico for custodial interference. When Deputy Fowler asked Mother about the warrants, she gave him "some paperwork" that she said addressed the New Mexico incident and told him she had one child in the car with her. Deputy Fowler turned away from the vehicle to talk to his dispatch office and heard the engine of Mother's vehicle revving. Mother then "took off" in her vehicle with no lights on.[2] Deputy Fowler then notified dispatch that he was pursuing Mother and activated his lights and sirens. Mother drove westbound on State Highway 71, reaching speeds over 100 miles per hour. Mother then turned and travelled eastbound on State Highway 71 before turning off on Highway 955, stopping, and waving her arms out of the vehicle's window "like she was giving up." When Deputy Fowler approached the vehicle, Mother drove off again, travelling westbound on State Highway 71, reaching speeds over 111 miles per hour. Dispatch notified Deputy Fowler that another officer was on the way with a tire deflation device. After deploying the device, two tires on Mother's vehicle deflated and she pulled over on the

---

[2] Mother turned her lights on after traveling about 1/8th of a mile.

2

side of the road into the parking lot of a business. When the officers got Mother out of her vehicle they noticed that there were in fact three children inside; nine-year-old Jeff, six-year-old Eric, and three-year-old Frank. Mother was taken into custody and charged with evading arrest with a motor vehicle and child endangerment. Deputy Fowler stated that Mother had been driving at a dangerously high rate of speed on a dark roadway where animals and livestock are sometimes present on the road and that at that rate of speed she could easily have lost control of the vehicle and injured herself, her children, and third parties. The three children were transported to the Fayette County Sheriff's Office, which notified the Department.

Alejandra Cerda, a Department investigator, met with the children at the Sheriff's Office. Cerda was told that Mother's brother was unable to leave his county of residence because he was on probation and could not retrieve the children. Cerda spoke with Jeff, who stated that he was nine years old and does not attend school because "he is going on a road trip" to see his uncle in Texas. Jeff said the family had been on the road trip "for about a week." Jeff said that they were eating sandwiches, eating out, and had made hamburgers in the car using an electric mini-grill. They had been sleeping in the car and taking showers at gas stations. Other than a "nana" in Albuquerque, New Mexico, Jeff said he has no other family. Jeff reported feeling safe with Mother and that he had not been left home alone by her. Cerda attempted to speak with Eric, but could not get him to wake up to speak with her. Cerda could not speak with Frank "due to his age and being nonverbal." Cerda reported that Eric and Frank appeared to be dirty and "had a foul odor." The children did not have jackets and Frank did not have shoes or socks. The Sheriff's Office had provided them with blankets and the children appeared to be healthy and unharmed.

Cerda met with Mother at the Fayette County Jail. Mother said that she and the children were sleeping in the car while on their way to visit her brother who she stated lived in Sweeney. Mother said that when confronted with the warrants she "made the stupid decision to run" resulting in her children being removed from her care again. Mother reported that she had Child Protective Services history in Albuquerque originating in 2020 when her children were removed from her care because Frank's father had been "involved in a child murder" and the community backlash caused CPS to investigate.[3] While the New Mexico CPS case was still open, Mother was charged with custodial interference for taking the children from CPS custody without permission. Mother stated that the New Mexico CPS returned her children to her care in 2021. Cerda determined that removal of the children was necessary because Mother and the children were from New Mexico, Mother had fled from law enforcement at high speeds with the children in the car, Mother was in the Fayette County Jail, and there was no other relative or parent available to take possession of the children.[4] The Department sought temporary managing conservatorship of the children.

The Department provided Mother with a family reunification plan that required her to take a protective parenting class, undergo drug testing, undergo a psychological exam, participate in counseling due to her history of drug use, and demonstrate "lifestyle changes." The Department told Mother that if she tested positive for drugs it would require an OSAR evaluation followed by appropriate treatment. Mother completed a parenting class while incarcerated and, after her release, resided in a transitional living facility. After living at the

---

[3] The criminal charges against Frank's father did not involve any of Mother's children, and she denied being aware of them at the time she was in a relationship with Frank's father.

[4] Mother reported that she did not know where Jeff's father was living, that Eric's father lived somewhere in Kentucky, and that Frank's father was incarcerated.

transitional living facility for a month and a half, Mother moved to New Mexico. The children were placed in a group home in Texas and were later relocated to live with Mother's Cousin in Kentucky.

When Mother moved to New Mexico from the Texas transitional living facility, the Department informed her that it would be unable to provide her any services because it did not have the ability to contract with out-of-state providers. The Department advised Mother that she would have to seek out and pay for services in New Mexico on her own and that, to establish her sobriety, Mother would need to pay for drug testing in New Mexico. Mother did not provide the Department with any drug test results. Mother completed a psychological exam that identified some mental health issues, including bipolar disorder, cannabis use disorder, adjustment disorder with depression, and behavior described as "hostility" and "scapegoating" of the children. Mother travelled from New Mexico to attend some of the scheduled in person visits with the children and had telephone visits with them until visitation was suspended in July 2025 at the request of the Court Appointed Special Advocate (CASA) who cited concerns about Mother's hostile and threatening communications with the children's placement and the observation that the children's behavior declined significantly after virtual visits with Mother.

During a one-day bench trial in September 2025, the Department asked the court to terminate Mother's parental rights to the children and for their current placement to be continued and approved. At that time, the children were living with Mother's Cousin in Kentucky. The CASA agreed that termination of Mother's parental rights was in the children's best interest. The Department's witnesses referenced Mother's CPS case in New Mexico; her

taking the children from CPS custody; and the assault family violence[5] and evading arrest charges resulting from the high-speed police chase. The Department was concerned that, although Mother had completed a parenting class, she had not demonstrated lifestyle changes that the Department believed were necessary to provide the children with a safe environment. The Department also expressed concerns because it did not know if Mother was sober and did not know if she was receiving treatment for her mental health issues. The Department witnesses testified that Mother was hostile in her communications with the Department and with the children's placement, to the degree that the placement requested that Mother be prevented from directly communicating with her. The Department witness testified that the placement had to "get law enforcement in Kentucky" involved due to Mother's harassing behavior. This caused the Department to be concerned about unaddressed anger management issues. The court heard testimony that the children were thriving in their placement, that they wanted to be there, and that "things are great right now for them."

The Department acknowledged that the children were bonded with Mother because of their ages and because they had been in her care for most of their lives. Mother regularly reached out to the Department for updates on the children, demonstrating to the Department that she cares about their well-being. In the Department's view, Mother's moving from Texas to New Mexico during the pendency of the case frustrated its ability to provide her services and obtain sufficient evidence of her sobriety, and "put the burden on Mother" to demonstrate her ability to provide a safe environment for the children. The CASA testified that

---

[5] The assault family violence charge arose from a physical altercation between Mother and her aunt after a day at the beach. Mother testified that after coming home from the beach, her aunt was drinking and hit Mother. Mother stated that she hit her aunt back, and the aunt and a cousin "jumped" Mother. The record does not reflect whether the children were present during this incident.

the current placement is committed to taking care of the children long-term, and that they are happy and doing well in school. The CASA expressed concerns about Mother's hostile and erratic behavior regarding the children's placement, including her calling the Kentucky law enforcement officers to the placement's home for a welfare check in the middle of the night the day that the children were transported to Mother's Cousin's house, despite the CASA's belief that Mother was aware that the children had arrived safely. The CASA also testified that Mother had provided inauthentic photographs showing injuries to the children that she asserted had occurred at their placement. The CASA was concerned as well that Mother was violating court orders by attempting to contact the placement rather than communicating through the Department.

Mother testified extensively at trial. She explained that she had pleaded guilty to the charge of evading arrest because she was guilty. Mother agreed that the high-speed chase was dangerous to her children and had been a mistake but claimed that she had fled from the police only so they would not take her children from her. Mother testified that she returned to New Mexico after being released from jail after the high-speed chase because it was difficult for her to comply with the service plan while she lived in transitional housing in Texas. Mother stated that when she and her mother travelled to Texas to visit her children the Easter following her arrest and incarceration, her mother was arrested at the Texas-New Mexico border for possession of fentanyl and was taken to jail. Mother testified that the police "claimed to have found fentanyl" in her mother's backpack "but there's nothing that can corroborate that at this point."

Mother testified that, until the night she called police to conduct a welfare check on the children in Kentucky, she and Cousin had been in regular communication and had

7

discussed the children and their needs. Mother testified that she called the police to Cousin's home in Kentucky because she was worried about the children and not to harass or intimidate anyone. Mother testified that she believes the children's current placement to be a good one and that if the court did not terminate her parental rights, she would want them to remain at Cousin's house until she gets "all the way settled and off parole." Mother testified that she lived with Yolanda and Deborah Littleton in Albuquerque, New Mexico but said that she would be willing to move to another state to be near the children. She also testified that if the children were returned to her care she would move with them to Los Angeles, California where her husband is living.

Regarding the removal of the children from her care in New Mexico, Mother testified that it occurred because of her relationship with Frank's father, who had been charged with child abuse resulting in the death of a child and dismemberment of the child's body. Mother stated that she was not living with Frank's father when he committed those crimes and that even though Frank's father "was not doing anything wrong when she was with him," New Mexico CPS "wrongly removed the children and wrongly placed them in an abusive foster home." Mother denied knowing about Frank's father's criminal case and stated that she never heard him talking to any probation officer or bondsman. Mother stated that she did not know why Frank's father was not incarcerated until 2023 when the criminal charges stemmed from an incident that occurred in 2016, saying: "That would be a question you would have to ask him directly." Mother testified that he was not aware of the charges when she was living with Frank's father and that he had given her "a false name."[6]

_____

[6] Mother provided no explanation for why Frank shares the same name as his father, nor did she explain when she learned of the criminal charges and what she did in response.

During a December 2021 visit during the New Mexico CPS case, Mother observed that Jeff had bruising on his hands and Eric's hair was matted. Mother testified that she reported this to New Mexico CPS but they did nothing. Mother stated that she took the children from New Mexico CPS custody because she was concerned for their well being in foster care. Mother was charged with custodial interference, received a deferred sentence, and later was able to regain custody of the children in 2022. At that time, Jeff attended a public elementary school but, in 2023, Mother lost her car and was unable to take them to school so she started home schooling them using an online program.

Mother testified that she has learned in therapy how to handle stressful situations and to "process" the situation instead of reacting to it. Although the parenting class was helpful and taught her skills she can implement in the future, Mother acknowledged that she "still has some work to do." She agreed that contact between her and the children would need to be a stairstep progression. Mother also testified that if her parental rights were terminated, she would be devastated but that she would not go to Kentucky to try to take the children or interfere with their placement.

The trial court signed an order terminating Mother's parental rights to Jeff, Eric, and Frank, finding by clear and convincing evidence that Mother had knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being, that Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and that termination of the parent-child relationship between Mother and the children was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). Mother appeals.

9

## STANDARD OF REVIEW

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the statutory predicate grounds and that termination is in the best interests of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re R.R.A.*, 687 S.W.3d 269, 271 (Tex. 2024); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018) ("Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection."). Parental rights have been described as "essential," "a basic right," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 64 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually sufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinning of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* In reviewing findings for factual sufficiency, we must give due deference to the factfinder's findings and cannot supplant the factfinder's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108-09 (Tex. 2006) (per curiam); *see In re C.E.*, 687 S.W.3d at 314 (stating that factfinders are "sole arbiters of the credibility of the witnesses and the weight to be given to their testimony" and "entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case"); *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing

termination order, appellate courts defer to "decision of the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

## DISCUSSION

### Reasonable efforts to reunify the children with Mother

Mother asserts that there is legally insufficient evidence to support the trial court's determination that the Department made reasonable efforts to reunify the children with her. *See* Tex. Fam. Code § 161.001(f)(1). Mother argues that "there is no evidence CPS made a sincere effort to reunify this family." Subsection 161.001(f) provides that:

> (f) In a suit for termination of the parent-child relationship filed by the Department of Family and Protective Services, the court may not order termination of the parent-child relationship under Subsection (b)(1) unless the court finds by clear and convincing evidence and describes in writing with specificity in a separate section of the order that:

> (1) the department made reasonable efforts to return the child to the parent before commencement of a trial on the merits and despite those reasonable efforts, a continuing danger remains in the home that prevents the return of the child to the parent; . . .

*Id.* The court filed the following findings of fact:

> 2.1 The Court finds by clear and convincing evidence that the Department made reasonable efforts to return the children to the parents. However, despite those reasonable efforts to return the children home to the parents, a continuing danger remains in the home that prevents return.

> 2.2 The Court specifically finds that those reasonable efforts include the following:

12

2.2.1 The Department created a family service plan that is narrowly tailored to address any specific issues identified.

2.2.2 The Department set up services for [Mother] while she was incarcerated and when she was released.

2.2.3 The Department facilitated parent-child visits even after the parents were located out of state.

2.2.4 The Court extended the original dismissal date of the case and the Department allowed extra time to work services.

Mother asserts that the record contains evidence showing that the Department failed to communicate with her, failed to inform her about and set up certain services, failed to return her phone calls and correspondence, and failed to maintain accurate notes and records regarding her efforts to complete the services set forth in the family service plan.

"The concept of a 'reasonable effort' to return the child is effectively a sliding scale, depending on the situation." *In re K.T.J.M.*, No. 06-09-00104-CV, 2010 WL 1664027, at *4 n.12 (Tex. App.—Texarkana Apr. 27, 2010, no pet.) (mem. op.). It is well established that "reasonable efforts" to reunite a parent and a child can be satisfied through the preparation and administration of a service plan. *See, e.g.*, *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.); *C.G. v. Texas Dep't of Fam. & Protective Servs.* No. 03-18-00852-CV, 2019 WL 3367524, at *7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.). "While implementation of a family service plan by the Department is generally considered a reasonable effort to return a child to the parent, that is not the only evidence which can satisfy this element." *In re F.E.N.*, 542 S.W.3d 752, 766 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). "The Department's efforts to place the child with relatives may constitute legally and factually

13

sufficient evidence to support the trial court's finding that the Department made reasonable efforts." *In re J.G.S.*, 550 S.W.3d 698, 704-05 (Tex. App.—El Paso 2018, no pet.). The proper inquiry is whether the Department made reasonable efforts, not ideal efforts. *In re M.V.G.*, 440 S.W.3d 54, 61 (Tex. App.—Waco, 2010 no pet.); *In re J.A.*, No. 04-20-00242-CV, 2020 WL 5027663, at *2 (Tex. App.—San Antonio Aug. 26, 2020, no pet.) (mem. op.). "The issue before us is whether the Department's reunification efforts were reasonable under the circumstances." *In re M.N.M.*, 708 S.W.3d 321, 328 (Tex. App.—Eastland 2025, pet. denied).

The evidence at trial was that the Department provided Mother with a service plan and, while incarcerated, she completed some of the required courses. Mother testified that she communicated with her caseworker and the caseworker's supervisor, stating "I can't say they were the best, but they did give me somewhat of communication." Mother stated that the Department caseworker assigned to her did a good job of keeping her informed about the children and that the supervisor would return her communications when he could. The Department informed Mother that it would be unable to arrange for and pay for services if she left the State of Texas, and Mother moved to New Mexico after she was told that it would be her responsibility to provide proof of sobriety and of completing the family service plan. There was evidence that the Department facilitated Mother's visits with the children, both in person and virtually and even after Mother had moved to New Mexico. The Department also arranged for a relative placement for the children with Mother's Cousin, and Mother agreed that this placement was good for the children.

There was evidence that the Department created a detailed service plan for Mother, provided Mother with opportunities to visit the children, and placed the children with a relative whom Mother agreed was a good placement. Viewed in a light favorable to the

14

judgment, the evidence was legally sufficient for the factfinder to conclude that the Department made reasonable reunification efforts.

**Statutory ground for termination of Mother's parental rights**

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings of statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). We limit our review to the trial court's finding that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See id.* § 161.001(b)(1)(D); *J.B.M.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *8 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.) (court may consider one endangerment finding under either (D) or (E) without addressing the other endangerment finding, even in cases where the other finding is challenged on appeal).

Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 522 (Tex. 1987). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. Subsection (D) authorizes termination of parental rights if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). Subsection (E) authorizes termination of parental rights if clear and convincing evidence establishes that the parent "engaged in conduct or knowingly

15

placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Although both grounds require proof of endangerment, they are otherwise separate and distinct grounds. *See A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

The primary distinction between subsections (D) and (E) is the cause of the endangerment to the child's physical or emotional well-being. *S.H.A.*, 728 S.W.2d at 85. Under subsection (D), the focus is on "conditions or surroundings" that endanger the child, while under subsection (E), the focus is on "conduct" that endangers the child. *Id.* Moreover, "[a] single act or omission can support termination under subsection (D)," *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.), while "termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied).

Also, subsection (D) always requires proof of scienter, i.e., evidence that parents "knowingly" placed or "knowingly" allowed their child to remain in endangering conditions or surroundings. *See In re T.H.*, 131 S.W.3d 598, 603 (Tex. App.—Texarkana 2004, pet. denied); *cf. In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) ("Scienter is not required for an appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts."). "Subsection D is not a basis for terminating parental rights if the parent is unaware of the endangering environment." *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "So, in scrutinizing the endangerment finding, we focus not only on evidence of endangerment but also

16

on evidence showing the parent's awareness of the endangering environment." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

The evidence at trial was that Mother had evaded arrest by driving, initially without headlights on at night, at speeds over 100 miles per hour with her children in the car. Mother first drove westbound on a state highway at this high rate of speed, then turned around and travelled eastbound on the same highway and pulled over to wave at the pursuing officer as if she was going to cease her efforts to evade arrest. Instead, Mother again drove westbound at speeds over 100 miles per hour and did not stop until police deployed a deflation device that deflated her tires and caused her to have to pull over. The arresting officer testified that her speed was dangerous to herself, to the children, and to others. He stated that at that speed she could easily have lost control of the vehicle and caused injury to herself and the children. He also stated that animals roam near the roadway in that area making driving at a high rate of speed even more dangerous. Mother testified that she knows she made a mistake and that her actions were not "appropriate" for a parent. Mother stated that she reacted emotionally and did not make a conscious decision to put the children in danger. Mother testified that "in her heart" she thinks she did endanger the children by fleeing from the police, stating that she made a "dangerous and bad decision."

We conclude that the evidence is legally and factually sufficient to support a finding that Mother knowingly placed the children in conditions or surroundings which endangered their physical or emotional well-being so as to support a finding of endangerment under subsection (D). *See J.M.B.H. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00661-CV, 2023 WL 2920315, at *5-6 (Tex. App.—Austin Apr. 13, 2023, pet. denied) (mem. op.) (concluding that evidence that Mother allowed children to ride in car driven

17

by intoxicated Father endangered children under subsection (D)); *In re A.R.G.*, No. 04-19-00749-CV, 2020 WL 1277739, at *3 (Tex. App.—San Antonio Mar. 18, 2020, no pet.) (mem. op.) (concluding that evidence showing that "Mother drove with her children in her car while under the influence of methamphetamines support[ed] the trial court's finding that the children were endangered, thereby jeopardizing their safety, within the meaning of subsection (D)"); *In re R.H.*, No. 10-17-00054-CV, 2017 WL 4293268, at *5-6 (Tex. App.—Waco Sept. 27, 2017, pet. denied) (mem. op.) (concluding that children were endangered under subsection (D) when they were inside Mother's "disabled vehicle on the railroad tracks—a dangerous situation"). Because section 161.001 requires proof of only one statutory predicate ground to support termination, *see A.V.*, 113 S.W.3d at 362, we need not consider whether the evidence is sufficient to prove that Mother endangered the children under subsection (E); *see* Tex. R. App. P. 47.1.

**Best interest**

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(b0(20. Relevant factors in assessing the best interest of a child include (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the

18

child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). These factors are not exhaustive, no one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the Holley factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*, No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.).

Some evidence in the record indicates that termination is not in the best interest of the children. The record shows that the children are bonded with Mother; that Mother "discourages bad behavior" by the children; and that Mother encourages them to make good choices, be kind to each other, and listen to their placement. The CASA described Mother as an active parent who is sometimes "overzealous." Mother worked many of the services outlined in the Department's plan and stated that she has learned some coping mechanisms to use in circumstances that frustrate her. Mother attempted to send school supplies to the children, participated in in-person and video visitation with the children, and consistently sought information from the Department about the children's well-being. Until Mother's Cousin requested that Mother not contact her directly, Mother spoke regularly with this placement about the children's behavior, needs, and preferences. Moreover, Mother testified that her actions, including acts of custodial interference and the high speed car chase were done in an attempt to protect her children and keep them with her.

19

But evidence in the record also supports a finding that termination is in the children's best interest. The children are placed with a relative and both the Department and Mother agree that the placement is a good one. Mother has a history of removing her children from CPS custody and taking other actions that have resulted in her incarceration. Mother has an assault family violence charge against her arising out of an altercation with her aunt and a cousin; there was no evidence that this case has been resolved. Mother had a relationship with Frank's father, a person who had been charged with injury to a child involving death and dismemberment of the corpse. Although Mother denied knowing about the charges until she learned of them later in a "news report," a reasonable factfinder could disbelieve that Mother was unaware of the charges, which resulted in a 37-year prison term for Frank's father. Mother testified that her relationship with Frank's father caused New Mexico CPS to remove the children from her care and described the action as "an unlawful taking of my children and a backlash to [Frank's father's] criminal case." Mother stated that Frank's father "was not doing anything wrong" when she was with him and that the CPS removal was "wrong." A reasonable factfinder could conclude that Mother was diminishing the seriousness of Frank's father's egregious crimes resulting in the death and dismemberment of another child and the danger he could present to the children. At trial Mother was inconsistent about her plans for the children stating first that they would remain with her cousin and she would relocate to Kentucky to be near them while she completed probation and "transition[ed] slowly" but later stating that she planned to move with the children to Los Angeles to be with her current husband. Despite her plans, Mother offered no testimony at trial regarding the husband, whom she married in 2022, or what type of living conditions the children would be in if they moved to California with Mother.

There was evidence that the children are thriving in their placement and that it can be a long-term placement for them. The Department acknowledged that Mother had worked her services but expressed concern about her ability to provide the children with a safe and stable environment. The Department expressed concern about Mother's sobriety, which it had not confirmed because she moved out of the state and had not provided them with drug testing comparable to what it would have required had she remained in Texas. The Department also expressed concern about Mother's hostility when communicating with the Department and the placement and her unaddressed anger management and mental health issues.

Viewing the evidence presented at trial in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Mother's parental rights was in the children's best interest. Accordingly, the evidence is legally sufficient to support the best-interest finding. Similarly, we are unable to say that the evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Mother's parental rights was in the children's best interest. Consequently, the evidence is also factually sufficient to support the finding. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630-31. We overrule Mother's challenge to the best-interest finding.

**Conservatorship**

Mother asserts that the evidence is legally and factually insufficient to support the court's finding that appointing Mother as the children's permanent managing conservator is not in their best interest. We have, however, already concluded that the evidence was sufficient to support the trial court's endangerment and best-interest findings. In this context, Mother does

21

not have standing to challenge the portion of the decree appointing the Department as the children's managing conservator. *See In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (explaining that order terminating the parent-child relationship divests parent of legal rights and duties with respect to child (citing Tex. Fam. Code § 161.206(b))); *see also A.P. v. Texas Dep't of Fam. & Protective Servs.*, Nos. 03-18-00780-CV, 03-18-00781-CV, 2019 WL 1342163, at *1 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding in context of parents' appeal from judgment terminating their parental rights, that parent lacked standing to challenge trial court's striking of grandmother's petition in intervention and collecting cases in which court concluded that appealing parents lacked standing to complain of errors that did not injuriously affect them or that affected rights of others); *In re H.M.M.*, 230 S.W.3d 204, 204-05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding court lacked jurisdiction to consider mother's appeal of trial court's failure to grant sole custody to her father after it terminated her parental rights). Further, once an appellate court overrules a parent's challenge to an order terminating the parent's rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *See In re J.D.G.*, 570 S.W.3d at 856 (citation omitted). We overrule Mother's challenge to the trial court's conservatorship finding.

## CONCLUSION

We affirm the trial court's order of termination.

_____

Karin Crump, Justice

22

Before Chief Justice Byrne, Justices Crump and Ellis
  Concurring in part, Dissenting in part by Justice Ellis

Affirmed

Filed:   March 27, 2026